# IN THE SUPREME COURT OF TEXAS

No. 16-0715

IN THE INTEREST OF H.S., A MINOR CHILD

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

JUSTICE BLACKLOCK, joined by JUSTICE JOHNSON, JUSTICE GUZMAN, and JUSTICE BROWN, dissenting.

Today the Court holds that nearly anyone who has "played an unusual and significant parent-like role in a child's life" may sue for legal rights of visitation and control over the child even if the child's parents remain actively involved in the child's life and oppose the non-parents' wishes. According to the Court, section 102.003(a)(9) of the Family Code dictates this outcome. I respectfully disagree.

Section 102.003(a)(9) grants standing to file a suit affecting the parent-child relationship to non-parents who have had "actual care, control, and possession of the child for at least six months." The court of appeals essentially reasoned that "actual care, control, and possession" of a child belongs presumptively to the child's parents. Thus, for a non-parent to achieve the "actual care, control, and possession" required for standing, the child's parents must first give up "actual care, control, and possession." We should adopt this simple formulation, primarily because it comports with the statute's text but also because it avoids potential encroachment on "the fundamental right of parents to make decisions concerning the care, custody, and control of their

children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion). Even if the choice were between two equally persuasive readings of section 102.003(a)(9)—and it is not—I would adopt the reading that avoids burdening parents' unalienable right to raise their children as they see fit, rather than the reading that follows modern trends in family law.

The Court instead condenses the statute's three-pronged requirement of "actual care, control, and possession" into one question: Did the non-parent "play[] an unusual and significant parent-like role in a child's life"? *Ante* at __ [19]. In the Court's view, this "parent-like role" may be played simultaneously by parents and by multiple non-parents alike. As a matter of statutory interpretation, the principal defect in the Court's approach is its failure to afford independent meaning to the statute's "actual control" requirement apart from the control already entailed in "actual care" and "actual possession." The result is that parents who remain in control of their children's lives can be forced into visitation and custody fights over their own children by any non-parent whose relationship with the child triggers the Court's malleable "parent-like role" standard. The Court rightly recognizes that non-parents who care for and reside with a child may often develop a special bond with the child. Heather's grandparents surely have such a bond with Heather, and I join Justice Guzman in commending them for their admirable willingness to help provide for Heather during a difficult time in her parents' lives. But Texas law recognizes the unique, exclusive, and constitutionally protected relationship between parents and their children. One way it does so is through section 102.003(a)(9), which limits non-parent standing in custody and visitation cases to situations in which parents no longer exercise their unique and exclusive right of "actual control" over their child. Only then can a non-parent take up the "parent-like role"

2

of "actual control" required for standing. No one can fully stand in a parent's shoes unless the parent first steps out of those shoes and walks away.

In the case before us, the child's Mother and Father sent their daughter "Heather" to live with her Grandparents for a temporary period. After an evidentiary hearing, the trial court found that although Grandparents were Heather's primary caregivers during this time, both Mother and Father remained actively involved in their daughter's life, made medical decisions for her, and never intended to relinquish control over her upbringing to her Grandparents. I agree with the trial court and the court of appeals that the child's parents, not her Grandparents, retained "actual control" over her throughout the time in question. Because Grandparents did not have "actual care, control, and possession" of the child for the required six-month period, they failed to satisfy section 102.003(a)(9)'s standing requirements. We should affirm the court of appeals' judgment dismissing the case.

## I. Factual Background

The trial court entered detailed findings of fact supporting its conclusion that the child's parents remained sufficiently involved in her life to exclude the possibility that anyone else exercised actual control over her. We should review these findings of fact under a deferential legal sufficiency standard. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). The Court's recitation of the facts does not track the trial court's findings. We are obliged to afford the trial court's fact findings "the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Instead, the Court engages in its own summary of the testimony, some of which comports with the trial court's factual findings and some of which does not. This case turns primarily on a legal question of statutory construction,

3

and presumably the Court would reach the same conclusion on the meaning of section 102.003(a)(9) even if it had explicitly deferred to the trial court's fact-findings. But in any event, re-stating the facts as the trial court found them provides the best basis for understanding the nature of the case before us. The trial court found as follows:

Mother and Heather lived with Grandparents for several months before Mother moved out to begin a temporary stay at a rehab facility called Sober Living, where Mother could address her alcohol problem. Mother, Father, and Grandparents held a family meeting and reached an agreement regarding the terms of Heather's stay at Grandparents' house. Mother's absence was intended to be, and actually was, temporary. The living arrangement was a temporary solution until Mother was able to stabilize in her recovery. After her stay at Sober Living, Mother wanted Heather to live with her and for Father to continue co-parenting Heather.

During the time Heather lived with Grandparents, Mother continued to make certain decisions for Heather, including decisions regarding medical and wellness care. Mother gave Grandmother permission to take Heather to the doctor for specific doctor office visits. Mother signed a consent form allowing Grandparents to seek emergency medical care for Heather. Father also gave his authorization for Heather to receive medical care in case of emergency. On more than one occasion, a healthcare provider contacted Father for permission to provide medical care to Heather.

Grandmother kept Mother fully informed of Heather's activities. Grandmother consulted with and sought input from Mother and Father on decisions that needed to be made for Heather. Mother and Father both provided Grandmother with input regarding caring for Heather.

4

Mother left Sober Living in the evenings to visit Heather at Grandparents' house, where Mother would have dinner with Heather, bathe her, spend time with her, and put her to bed. Mother kept in constant contact with Heather while at Sober Living and would sometimes pick Heather up from daycare. Father often spent time with Heather too. Father kept her virtually every other weekend and would often see her more frequently. Both Mother and Father wanted Heather to spend even more time with Father. Even though Father and Mother never married, they had always done things together with Heather. Father is a fit father and has always been involved in Heather's life.

## II. Text of Section 102.003(a)(9)

Section 102.003 of the Family Code provides:

General Standing to File Suit. (a) An original suit may be filed at any time by: . . . (9) a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition; . . . . (b) In computing the time necessary for standing under Subsection[] (a)(9) . . . the court may not require that the time be continuous and uninterrupted but shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit.

The outcome of this case depends on the meaning of these words. As always, we must "presume the legislature chose a statute's language with care." *Hallmark Mktg. Co. v. Hegar*, 488 S.W.3d 795, 798 (Tex. 2016). This presumption of careful choice includes a presumption that "each word [was] chosen for a purpose." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). Every word and phrase should be given meaning, and we must not "omit or gloss over verbiage in an attempt to reclaim clarity." *Centerpoint Builders GP, LLC v. Trussway Ltd.*, 496 S.W.3d 33, 36 (Tex. 2016); *see also BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("Separation of powers demands that judge-interpreters be

5

sticklers."). If possible, no words should be rendered meaningless or treated as surplusage. *Kallinen v. City of Houston*, 462 S.W.3d 25, 28 (Tex. 2015).

The dispute is over the statutory phrase "actual care, control, and possession." "Words and phrases that are not defined by statute and that have not acquired a special or technical meaning are typically given their plain or common meaning." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). Here, the statute does not define its terms, and they have not acquired a special or technical meaning. "Actual" means "[e]xisting in fact; real," as opposed to "constructive." *Actual*, BLACK'S LAW DICTIONARY (10th ed. 2014) [hereinafter BLACK'S]. Here, the term modifies each of "care, control, and possession." "Thus, a person asserting standing under section 102.003(a)(9) must show actual care, actual control, and actual possession." *Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 532 (Tex. App.—Austin 2011, no pet.).

"Care" means the "provision of physical or psychological comfort to another," *Care*, BLACK'S, and "concern; regard . . . watchfulness . . . oversight, or management, implying responsibility for safety," *Care*, WEBSTER'S NEW INT'L DICTIONARY (2d ed. 1960) [hereinafter WEBSTER'S]. "Control" means "[t]he direct or indirect power to govern the management and policies of a person or entity . . . the power or authority to manage, direct, or oversee." *Control*, BLACK'S. It means "[t]he act or fact of controlling; power or authority to control; directing or restraining domination; as under parental *control*." *Control*, WEBSTER'S. It is "the act or power of . . . command." *Control*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987) [hereinafter RANDOM HOUSE]. "Possession" means "the exercise of dominion over . . . something," *Possession*, BLACK'S, and "actual holding," *Possession*, RANDOM HOUSE.

6

This case comes down to what "actual control" means and whether Grandparents had it. Mother and Father do not dispute that Grandparents had "actual possession" of Heather. As for "actual care," Grandparents' primary daily responsibility for the supervision, discipline, and safety of Heather supports the conclusion that they had actual care over her, though the trial court disagreed. Since actual possession, actual care, and actual control are all required for standing, we need not decide whether Grandparents had actual care of Heather if they did not have actual control.

Because every word in the statute must have meaning and no words should be treated as surplusage, the court of appeals correctly observed that "'control' in section 102.003(a)(9) means 'something more than the control implicit in having care and possession of the child.'" *In re H.S.*, No. 02-15-00303-CV, 2016 WL 4040497, at *4 (Tex. App.—Fort Worth July 28, 2016, pet. granted) (mem. op.) (quoting *In re K.K.C.*, 292 S.W.3d 788, 792 (Tex. App.—Beaumont 2009, no pet.)). The Court's reasoning, however, fails to give meaningful effect to the statute's "actual control" requirement beyond the elements of control already included in "actual possession" and "actual care." "Control" cannot mean providing daily supervision, clothing, food, transportation, and the like. If it did, then "control" would be the same thing as "care," rendering one statutory term or the other superfluous. And if "control" were merely the physical holding of the child, then "control" would be the same thing as "possession," again rendering one term or the other superfluous. Instead, "control" must mean something distinct from "care" and "possession."

In the context of child-rearing, "control" of a child entails the power and authority to make important decisions about the child's life. As the definitions cited above indicate, to have "control" of a child is to "govern," "oversee," and "direct" the child. This means more than day-to-day or

7

hour-to-hour supervision and discipline—and certainly more than deciding "when [a child] gets up and goes to bed, how much television she watches, [and] whether she gets dessert." *Ante* at __ [12]. It means responsibility for the important choices that must be made for the child—choices about where she will live, her medical care, her education, and her future. Such control is by its nature, and by law, the exclusive right and duty of parents in the first instance.[1] When important decisions must be made for a child, someone bears ultimate responsibility for them no matter how many other caregivers may be involved in the child's life or consulted on the decision. Unless the child's parents refuse or shirk this responsibility, it is theirs both in law and in fact.

Parents often delegate matters of day-to-day care and possession to others, such as schools or family members. Doing so does not reduce the parents' control over their child or share "parent-like" control with others. To the contrary, determining where a child will be and who will care for her is a quintessential exercise of parents' exclusive control over their children. Deciding to share possession and care of a child with others is an exercise of the parents' control over the child, not a sharing of parental control or a relinquishment of it. Even if physically absent, a parent does not hand over control of her child merely by handing over physical possession and care. Again, if that were the case, "control" would have no role to play in section 102.003(a)(9).

Citing *Coons-Andersen v. Andersen*, 104 S.W.3d 630, 636 (Tex. App.—Dallas 2003, no pet.), the Court agrees with the notion that section 102.003(a)(9) is in harmony with the common law concept of *in loco parentis*. *Ante* at __ [10]. But under the classical understanding of *in loco parentis*, the parent retains ultimate control of the child while consciously delegating possession

---

[1] *See, e.g.*, TEX. FAM. CODE § 151.001 ("Rights and Duties of Parent. (a) A parent of a child has the following rights and duties: (1) the right to have physical possession, to direct the moral and religious training, and to designate the residence of the child; (2) the duty of care, control, protection, and reasonable discipline of the child; . . . .").

8

and care of a child to another, such as a family member or boarding school. Such intentional delegation of a portion of parental authority is a reflection, not a reduction, of parents' exclusive control over their children. 1 WILLIAM BLACKSTONE, COMMENTARIES *453–54 ("[The father] may also delegate part of his parental authority" to someone "who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge.").

The Court suggests that the parents' ultimate *legal* responsibility for the child is irrelevant to the inquiry because the statute requires "actual control," not "legal control" or "constructive control." *Ante* at __ [10]. This distinction between "legal control" and "actual control" matters, but the Court takes it too far. That Mother and Father retained their legal rights as Heather's parents does not by itself foreclose Grandparents' claim to "actual control" of Heather. But the Court mistakenly treats legal control and actual control like opposites, when in fact they go hand in hand nearly all the time. *See Marino v. Lenoir*, 526 S.W.3d 403, 409 (Tex. 2017) ("[Legal] is not ordinarily used as the opposite of, or in contrast to, actual."). Parents' exclusive, ultimate legal control over their children is no mere lawyerly construct. It is an *actual* fact of life that almost always dictates who *actually* controls the child. Sometimes, usually in very difficult circumstances, legal and actual control are severed. When a parent leaves the picture, relinquishing the role of ultimate decision-maker for the child, the parent does not automatically lose legal control of the child. But the parent does forfeit actual, factual control to whoever steps into the parent's shoes as the functional equivalent of the child's parent. The person who steps into the absent parent's shoes does not have all the legal rights of a parent without court action, but he has "actual control" of the child for purposes of section 102.003(a)(9) because he is functionally the child's ultimate decision-maker. The court of appeals correctly discerned that the

9

"actual control" required by section 102.003(a)(9) remains fused with the parents' legal control of the child unless the parents relinquish their ultimate decision-making responsibility for the child to someone else. *In re H.S.*, 2016 WL 4040497, at *5.[2]

Adopting this understanding of "control" as distinct from "care" and "possession" does not add extra words or requirements to the statute. *See Lee v. City of Houston*, 807 S.W.2d 290, 294–95 (Tex. 1991) ("A court may not judicially amend a statute and add words that are not implicitly contained in the language of the statute."). "Control" must mean something more than "care" or "possession." Understanding "actual control" as the factual responsibility to make the kind of decisions normally associated with legal control of the child gives "actual control" independent meaning based on its commonly understood definition, as we should do. This does not add a requirement to the statute. It gives life to the "actual control" requirement already contained in the statutory text. Actual control and legal control usually exist coextensively in the parents. When the parents relinquish their responsibilities, actual and legal control diverge, and someone else takes up actual control of the child even though the absent parents retain their legal status. Section 102.003(a)(9) grants that person standing, so long as the statute's other requirements are satisfied.

To illustrate the role "control" plays in section 102.003(a)(9), consider two scenarios in which a single Father has a Son. In the first, Father goes to work on an offshore oil rig for seven months, intending to return and resume his daily life with Son. He leaves Son with a close friend.

---

[2] *See also In re M.J.G.*, 248 S.W.3d 753, 759 (Tex. App.—Fort Worth 2008, no pet.) (denying standing for grandparents because parents had not "abdicated their parental duties and responsibilities to the grandparents"); *In re K.K.C.*, 292 S.W.3d 788, 793 (Tex. App.—Beaumont 2009, no pet.) (denying standing for non-parent because parent "did not relinquish to [non-parent] or abdicate her parental rights, duties, and responsibilities"); *In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.—Fort Worth 2008, no pet.) (denying standing for non-parents because "the evidence does not show that [mother] voluntarily relinquished permanent care, control, and possession of [child] to the [non-parents] for the six months preceding their filing of the suit").

Father and Son talk on the phone most nights, and the caretaker regularly consults with Father regarding Son's schoolwork, discipline, and extracurricular activities. Father also signs off on most medical treatment for Son. After six months, Father's friend asserts standing under section 102.003(a)(9) to sue for permanent possession of Son. But the friend lacks standing, because even though he had *care* and *possession* of Son, he did not have *control*; Father retained control. In the second scenario, Father again goes to work on an offshore oil rig for seven months and leaves Son with a close friend. This time, however, Father absconds from the rig and disappears with a girlfriend. No one hears from Father for over six months. The caretaking friend asserts standing under section 102.003(a)(9) to sue for custody of Son. In this scenario, there is little doubt the friend has statutory standing. Father functionally relinquished his control of Son to the friend and abdicated his parental control. Here the friend, not the Father, has actual control of Son.

The Court disagrees with this interpretation of actual control, but it recognizes that it should give effect to the statutory requirement of "control" beyond what is already entailed in "care" and "possession." To this end, the Court offers a definition of control: "exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children." *Ante* at __ [14].[3] The Court's emphasis on "day-to-day" matters blurs the statutory

---

[3] The Court's definition comes from the Austin Court of Appeals' decision in *Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523 (Tex. App.—Austin 2011, no pet.). In that case, the child's biological parents' rights had been terminated, and the State had legal custody of the child. The child then lived exclusively with a non-parent married couple for nearly two years. When the couple sued alleging standing on the basis of their "actual care, control, and possession" of the child, the State argued that its ultimate legal control over the child foreclosed the couple's standing. The court disagreed, holding that "legal control" was not a requirement of "actual control."

The Court relies heavily on several statements from *Jasek* about the distinction between legal control and actual control. Some courts of appeals have likewise relied on *Jasek*'s reasoning to support an expansive view of section 102.003(a)(9). But in *Jasek* the child's parents had left the picture completely. The dispute was between the child's functional (though not legal) parents and the child's legal "parent," an incorporeal government entity. In such a case, it makes perfect sense to conclude that the government's legal control of the child says little about who actually controlled the child. But the court in *Jasek* neither asked nor answered whether non-parents can achieve simultaneous "actual control" of a child along with *natural* parents who continue to actively control the child's life. Instead, the

11

distinction between daily care and ultimate control. But the Court fails to apply even its own flawed definition of "control." What is the nature of the guidance, governance, and direction typically exercised by parents with their children? The Court does not say. As explained above, one defining characteristic of the guidance, governance, and direction typically exercised by parents with their children is its exclusivity. The parent-child relationship is unique, both factually and legally. There may be abundant important opportunities for non-parents to direct and guide the child, but that does not make them the functional equivalent of the child's parents. As long as the parents remain actively involved in the child's life, there is little room for anyone else to exercise the control "typically exercised by parents" because the parents themselves already occupy that unique and special role.

The Court seems to acknowledge that its understanding of "actual control" has nothing to do with the ultimate decision-making authority "typically exercised by parents with their children." Instead, the Court limits its definition of "control" to the "day-to-day" matters of parenting. If all parental "control" means is deciding "when [a child] gets up and goes to bed, how much television she watches, whether she gets dessert, [and] when she needs to go to the doctor," then I can discern no distinction between "care" and "control." *Ante* at __ [12]. The Court apparently has the same trouble, which may be why it ultimately condenses the statute's three distinct requirements into a single "parent-like role" requirement. *Ante* at __ [20]. The correct approach is to give all three textual requirements—care, control, and possession—independent

---

court decided that a non-parent couple acting as the only functional parent figures for the child had "actual control" of the child even though a government entity was legally the child's "parent." *Jasek* was probably correctly decided. But we should not rely on dicta from *Jasek* about the ability of non-parents to achieve "actual control" of a child when *Jasek* did not involve a conflict between parents and non-parents as we normally understand those concepts.

12

meaning by recognizing that the true extent of parents' control over their children extends well beyond the day-to-day matters of childcare to which the Court constricts its analysis.

Turning to the facts of this case, the Court points to nothing about Heather's relationship with her Grandparents that amounts to the guidance, governance, and direction typically exercised by parents with their children. Rather than identify particular facts that establish each of the three required elements for standing—care, control, and possession—the Court settles for an amalgam of the three by asking whether Grandparents "played a parent-like role in Heather's life." *Ante* at __ [15]. The Court notes several facts about the relationship that supposedly demonstrate Grandparents' "parent-like role":

(1) Heather's principal residence was Grandparents' home;

(2) Grandparents were her primary caregivers;

(3) Grandparents paid for her food, clothes, and daycare, and managed her day-to-day activities;

(4) Grandparents took her to urgent care when necessary and took her to the doctor for checkups, though Mother made the check-up appointments; and

(5) Grandparents kept Mother and Father "reasonably informed" about Heather's activities and medical needs and involved them in decisions about her.

*Id.* The Court concludes from these facts that Grandparents "played a parent-like role in Heather's life." *Id.* That conclusion fails to appreciate the unique and exclusive nature of the parent-child relationship. But leaving that aside, the statute does not require "a parent-like role." It requires "actual care, possession, and control." Of the five facts identified by the Court, the first concerns possession, and the next two concern care. The fifth actually undercuts the Court's view that

13

Grandparents' exercised control over Heather similar to that typically exercised by parents with their children. Parents typically need not keep anyone else reasonably informed about their children's activities or involve others in decisions about them. Seeking the approval of another adult for a child's medical care and regularly reporting to that person about the child's activities— as Grandparents did here—are not signs of parent-like control. They are signs of its absence. They are signs that control actually lies with the one receiving the reports about the child, not the one making them.

The fourth fact listed above is the only one that potentially demonstrates Grandparents' "control." But the trial court's several fact-findings concerning Heather's medical care establish that Grandparents did not control this important element of Heather's life with anything resembling the control "typically exercised by parents." The trial court found that "[Mother] gave [Grandmother] permission to take [Heather] to the doctor," that "[Mother] continued to make certain decisions for [Heather], including certain medical and wellness care," that "[Mother] gave [Grandmother] authorization to obtain certain medical treatment for [Heather]" but that this "authorization was only for specific doctor office visits" or emergencies, and that "[Grandparents] did not get any type of surgery for [Heather] without [Mother] or [Father]'s consent." These fact-findings do not support the conclusion that Grandparents' involvement in Heather's medical care resembled the typical role of parents. Quite to the contrary, Grandparents had to regularly seek and obtain the permission of other adults before obtaining medical care for Heather. Nothing about that arrangement resembles the exclusive control over such decisions typically exercised by parents.

14

Nor do any of the trial court's other fact-findings support the conclusion that Grandparents' control over Heather was similar to that typically exercised by parents with their children. Throughout Heather's stay at her Grandparents' house, Father and Mother continued to exercise their ultimate power and authority as parents to govern their child. Heather's stay with her Grandparents resulted from an agreement that Father, Mother, and Grandparents reached during a family meeting. Everyone contemplated that the arrangement would be temporary. Mother intended for Heather to return to her upon the completion of her rehabilitation. Mother made many decisions for Heather, including many regarding medical care. Mother and Father both gave their consent for Heather to receive emergency medical care. Healthcare providers continued contacting Father for authorization to render aid to Heather. Grandparents regularly sought input from both Mother and Father regarding decisions that needed to be made for Heather. Heather stayed at Father's house every other weekend, and he saw her more often than that. And in the evenings Mother would go to Grandparents' house and have dinner with Heather, bathe her, spend time with her, and put her to bed.

There is no question that Mother and Father delegated a great deal of their parental responsibilities to Heather's Grandparents. But even applying the Court's definition of "control," these facts cannot support the conclusion that Grandparents exercised the guidance, governance, and direction typically exercised by parents with their children. Instead, the findings of fact support the view that Mother and Father's intentional, thoughtful, temporary delegation of some of their rights to physical possession and care of Heather demonstrated *the parents'* control over Heather—not control by others.

15

I would affirm the court of appeals' decision that "standing under section 102.003(a)(9) cannot be gained by a nonparent exercising care, control, and possession over a child in the absence of evidence that the child's parent . . . has abdicated his or her own . . . control . . . over the child to the nonparent." *In re H.S.*, 2016 WL 4040497, at *5. Here, there was no such evidence. Grandparents therefore lacked standing, and the trial court correctly dismissed the case.

### III. The Constitutional Implications

We should affirm the court of appeals' decision based solely on the text of section 102.003(a)(9). But there is yet another reason to favor an interpretation of the statute under which parents who have not relinquished their responsibilities cannot be subjected to courtroom custody fights by non-parents claiming "parent-like" status. Such an interpretation avoids the difficult constitutional questions raised by expanding the ability of non-parents to demand that a judge, rather than a child's fit parents, make decisions about the child's upbringing. *See HEB Ministries, Inc. v. Texas Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 658 (Tex. 2007) ("[W]e must construe statutes to avoid constitutional problems when we can . . . ."); *United States v. Albertini*, 472 U.S. 675, 680 (1985) ("Statutes should be construed to avoid constitutional questions . . . .").

The U.S. Supreme Court has on many occasions held that the U.S. Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66; *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] . . . to direct the education and upbringing of one's children . . . .") (citations omitted); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents

16

in the care, custody, and management of their child"); *Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course . . . ."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'") (quoting *Kovacs v. Cooper*, 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring)).

We generally follow the decisions of the U.S. Supreme Court on matters of federal constitutional law. *See In re Morgan Stanley & Co.*, 293 S.W.3d 182, 189 (Tex. 2009). We previously applied *Troxel* on ten occasions, including to reverse an order granting visitation rights to grandparents over the objection of the child's mother. *In re Mays-Hooper*, 189 S.W.3d 777 (Tex. 2006). The existence of parents' "fundamental liberty interest" in the care, custody, and control of their children is well-established in the Supreme Court's decisions. But the Supreme Court has not described the contours of the right with clarity. In *Troxel*, a case that deeply divided the Supreme Court, the plurality opinion recognized this lack of clarity but declined to ameliorate it: "[T]he constitutionality of any standard for awarding visitation turns on the specific manner in

which the standard is applied and . . . the constitutional protections in this area are best 'elaborated with care.'" *Troxel*, 530 U.S. at 73 (quoting *id.* at 101 (Kennedy, J., dissenting)).

While the Supreme Court has broadly recognized the constitutional interest of parents in the care, custody, and control of their children, the Court has not articulated a standard of review by which to judge the constitutionality of infringements upon parents' rights. Given the lack of precision in the Court's decisions, it is difficult to state a precedent-based rule distinguishing impermissible government interference with parental prerogatives from permissible government action to protect child welfare. *Troxel* was a grandparent-access case, like the case before us. The Supreme Court held that "special weight" must be afforded to a fit parent's decision whether "an intergenerational relationship would be beneficial" to the child. *Id.* at 70. But how much "special weight"? Under what circumstances can the parents' wishes be second-guessed by the government? Existing precedent does not provide clear answers.

One potential answer was proffered by Justice Thomas in his concurrence in *Troxel*: "I would apply strict scrutiny to infringements of fundamental rights. Here, the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." *Id*. at 80. Another potential answer is that proffered by the court of appeals, which interpreted *Troxel* to flatly prohibit non-parent standing "while a fit parent is appropriately exercising his or her own parental rights." *In re H.S.*, 2016 WL 4040497, at *5.

Yet another approach is that taken by the Court today. The Court's discussion of the constitutional issues assumes that the *Troxel* plurality opinion defines the outer limits of the Constitution's protections for parents in custody cases. The Court brushes aside the constitutional

concerns raised by Mother, Father, and the court of appeals because the Washington statute that *Troxel* invalidated allowed more expansive non-parent standing than Texas's statute. That is true. I agree with the Court that the reasoning of the plurality opinion in *Troxel* does not *compel* the conclusion that section 102.003(a)(9) as the Court interprets it is unconstitutional. The court of appeals' view that any judicial interference with the decisions of fit parents violates *Troxel* probably stretches *Troxel* beyond the plurality's reasoning. But saying a statute does not run afoul of *Troxel* is not the same thing as saying the statute is constitutional. As a matter of first impression, the rule announced by the court of appeals—that fit parents cannot be haled into court by non-parents to defend their decisions about the upbringing of their children—is certainly one plausible consequence of the Supreme Court's recognition of a "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel* does not tell us exactly where the line is between constitutional and unconstitutional government interference with the rights of fit parents. In this case and thousands of others like it in our family courts, parents' fundamental rights are at stake. We should not assume, as the Court does, that placing additional burdens on those rights has no constitutional significance just because the *Troxel* plurality opinion does not prohibit it.

The Court downplays the significance of this case because the issue before us is who has standing to bring a suit affecting the parent-child relationship, not the merits of whether the suit should succeed. But when the constitutional concern is preservation of the parents' right to be the ultimate decision-makers for their child, the distinction between standing and the merits evaporates. Once a custody or visitation case gets through the courthouse doors, a judge or group of judges—not the parents—will ultimately decide whether to uphold or reverse the parents'

19

decisions about their child's future. "Our system must confront more often the reality that litigation can itself be so disruptive that constitutional protection may be required." *Troxel*, 530 U.S. at 101 (Kennedy, J., dissenting). As a majority of the Supreme Court recognized in *Troxel*, "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.'" *Troxel*, 530 U.S. at 75 (quoting *id.* at 101 (Kennedy, J., dissenting)). No matter the presumptions or legal standards applied at the merits stage, giving a judge the power to review a parent's decisions about the extent to which non-parents should be involved in a child's life undermines the parents' role as the ultimate decision-makers for their child. This is unquestionably necessary in some cases for the protection of children whose parents would harm them. But for fit parents, true control of their children is an illusion if the courts really get to make the final call.

The Court correctly points out that the Family Code puts a thumb on the scale for parents at the merits stage by establishing a presumption that appointing the parents as managing conservators is in the child's best interest unless the appointment "would significantly impair the child's physical health or emotional development." TEX. FAM. CODE § 153.131(a). Although this presumption affords important protection to parents, it does not change the fact that once standing is established, the final decision about the child's future will be made by a judge or jury, not the child's parents. Under the U.S. Supreme Court's decisions, such government usurpation of parental authority raises serious constitutional questions. We could have and should have avoided those questions by faithfully enforcing the "actual control" requirement of the text of section 102.003(a)(9).

20

\* \* \*

The U.S. Supreme Court's decision to recognize the constitutional rights of parents through the questionable mechanism of substantive due process attracts its share of second-guesses. *See, e.g., Troxel*, 530 U.S. at 80 (Thomas, J., concurring) (suggesting that the Privileges and Immunities Clause may be the more appropriate place to look); Daniel E. White, *People v. Bennett: Analytic Approaches to Recognizing A Fundamental Parental Right Under the Ninth Amendment*, 1996 B.Y.U. L. REV. 183, 206–59 (1996) (suggesting the Ninth Amendment's acknowledgment of unenumerated "rights . . . retained by the people" protects parental rights); *In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982) (noting that "[t]he rights inherent in family relationships—husband-wife, parent-child, and sibling—are the most obvious examples of rights retained by the people" under the Ninth Amendment). Yet even the late Justice Scalia, perhaps the Court's most consistent and vociferous critic of the judicial enforcement of rights not specifically enumerated in the Constitution, concluded that "a right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.'" *Troxel*, 530 U.S. at 91 (Scalia, J., dissenting). Justice Scalia also viewed parents' rights as "among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'" *Id*. (reasoning that "the Constitution's refusal to 'deny or disparage' other rights is far removed from affirming any one of them, and even further removed from authorizing judges to identify what they might be, and to enforce the judges' list against laws duly enacted by the people").

I do not suggest that we should ever twist the words of a statute to accommodate constitutional concerns. Far from it. The best reading of the text of section 102.003(a)(9) requires a child's parents to relinquish or shirk their "actual control" of the child before a non-parent may assert the "actual control" required for standing. The Court need not proceed any further to resolve this case. But even if the interpretation of section 102.003(a)(9) adopted by the Court today were equally persuasive—that is, even if the statute's text supported two equally plausible readings—we should prefer the interpretation that avoids constitutional questions like those at stake here. We should likewise prefer the interpretation, as between two equally plausible interpretations, that better accommodates the unalienable rights proclaimed by the Declaration of Independence and retained by the people under the Ninth Amendment. In this case, the interpretation that avoids burdening parents' rights is also the textually superior interpretation, which makes the correct outcome doubly clear. Because the Court concludes otherwise, I respectfully dissent.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** June 15, 2018