**Affirmed and Memorandum Opinion filed January 27, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00105-CV

## JOSHUA ARMAND REYES, Appellant

## V.

## HOLLY LOTT, Appellee

**On Appeal from the 345th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-FM-19-005120**

## MEMORANDUM OPINION

Joshua Armand Reyes appeals from the trial court's final order dismissing his suit affecting the parent-child relationship (SAPCR) for lack of standing. *See* Tex. Fam. Code § 109.002. Reyes filed the SAPCR seeking conservatorship of T.G.L., who is the daughter of Reyes's former live-in girlfriend, appellee Holly Lott. Reyes alleged standing pursuant to Texas Family Code section 102.003(a)(9), which confers standing on "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more

than 90 days preceding the date of the filing of the petition." Tex. Fam. Code § 102.003(a)(9). The trial court, however, determined that Reyes did not have actual care, control, and possession of T.G.L. for the requisite time.

In two issues, Reyes contends that the trial court erred in determining that he did not have standing and in relying on the "parental presumption" and "best interest" standards in making that determination. We affirm.[1]

### *Background*

Lott gave birth to T.G.L. in March 2017. It is undisputed that T.G.L. has no contact with her biological father. Reyes, Lott, and T.G.L. lived together from January 2018 until July 2, 2019.[2] Lott gave birth to a second daughter, C.R.R., with Reyes in November 2018. After Lott moved out, Reyes filed a SAPCR regarding C.R.R., and Lott filed a counterpetition. On July 30, 2019, Reyes also filed the present SAPCR concerning T.G.L. In his petition, Reyes asserted standing alternatively under two provisions of the Texas Family Code: section 102.003(a)(9) (providing general standing for people who had actual care, control, and possession of the child), and section 102.004 (providing standing to certain individuals when the child's present circumstances would significantly impair the child's physical health or emotional development). Tex. Fam. Code §§ 102.003(a)(9), 102.004. In this appeal, Reyes only asserts standing under section 102.003(a)(9).

Lott filed a motion to dismiss, challenging Reyes's standing. The trial court

---

[1] Because this case was transferred by the Third Court of Appeals in Austin, we apply that court's precedent to the extent of any conflict with our own precedent. *See* Tex. R. App. P. 41.3.

[2] Reyes testified at the hearing on standing that they moved in together in October 2017. The trial court, however, found that they moved in together in January 2018, and Reyes does not specifically challenge that finding on appeal.

2

held an evidentiary hearing on the standing question at which both Reyes and Lott and Reyes's father testified. Thereafter, the trial court granted Lott's motion to dismiss and dismissed Reyes's SAPCR for want of jurisdiction. The court also entered detailed findings of fact and conclusions of law. We will begin by setting forth the law that governs our review before turning to the evidence introduced at the hearing, the trial court's findings, and the application of the law to the facts.

### *Governing Law*

A party seeking conservatorship of a child must have standing to seek such relief. *In re Ramirez*, No. 03-21-00145-CV, 2021 WL 1991269, at *3 (Tex. App.—Austin May 19, 2021, orig. proceeding) (mem. op.). Standing implicates a court's subject-matter jurisdiction and therefore is a question of law we generally review de novo. *See In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). The Family Code governs standing in SAPCRs; thus, a party seeking conservatorship must establish standing consistent with the statutory requirements. *See In re Ramirez*, 2021 WL 1991269, at *3.

As indicated, among other grounds, Reyes alleged standing pursuant to section 102.003(a)(9). A nonparent is granted SAPCR standing under that section

> if, for the requisite six-month time period, the nonparent served in a parent-like role by (1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents with their children.

*In re H.S.*, 550 S.W.3d at 159–60. The section does not require a nonparent to have exercised ultimate legal authority to control the child or that the parents must have wholly ceded or relinquished their own parental rights and responsibilities. *Id.* at 160. Instead, the section looks to whether the nonparent "served in a parent-like

3

role" to the child for the relevant time period, which can be shown by evidence the nonparent consistently made the kinds of day-to-day efforts and decisions associated with raising a child. *See id*. at 163; *In re Ramirez*, 2021 WL 1991269, at *4.

Lott challenged Reyes's standing in a motion to dismiss, which was effectively the same as a plea to the jurisdiction. *See Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015); *Buzbee v. Clear Channel Outdoor, LLC*, 616 S.W.3d 14, 22 (Tex. App.—Houston [14th Dist.] 2020, no pet.). A plea to the jurisdiction can challenge either the pleadings or the existence of jurisdictional facts. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). When, as here, the existence of jurisdictional facts is challenged, the court must consider evidence submitted by the parties when necessary to resolve the jurisdictional issue. *See Bland I.S.D. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

The parties disagree on the proper standards for reviewing the evidence submitted in this case. When jurisdictional facts or issues implicate or overlap with the merits in a case, the standing analysis mirrors that of a traditional summary judgment, and if the evidence creates a fact question regarding the jurisdictional issue, the trial cannot grant a plea to the jurisdiction but must await resolution of the fact issue by the factfinder. *Miranda*, 133 S.W.3d at 217-18; *GTECH Corp. v. Steele*, 549 S.W.3d 768, 773–74 & n.10 (Tex. App.—Austin 2018), *aff'd sub nom. Nettles v. GTECH Corp.*, 606 S.W.3d 726 (Tex. 2020). In these cases, many if not most of the jurisdictional issues or facts will also determine whether the plaintiff is entitled to relief on the merits. *Univ. of Tex. v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.—Austin 2009, no pet.). When, however, the jurisdictional issue is not intertwined with the merits of the claims, disputed fact issues are resolved by the

4

court. *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015); *Poindexter*, 306 S.W.3d at 806–07. The legal and factual sufficiency of the evidence to support those express or implied findings can then be challenged on appeal as with any other findings of fact. *Prewett v. Canyon Lake Island Prop. Owners Ass'n*, No. 03-18-00665-CV, 2019 WL 6974993, at \*2 (Tex. App.—Austin Dec. 20, 2019, no pet.); *Poindexter*, 306 S.W.3d at 806–07.

There appears to have been some inconsistency among the courts of appeals regarding whether jurisdictional facts pertinent to standing under section 102.003(a)(9) implicate or overlap with the merits of a determination of conservatorship in a SAPCR. *Compare In re D.K.P.*, No. 07-18-00158-CV, 2019 WL 4399475, at \*4 (Tex. App.—Amarillo Sept. 13, 2019, no pet.) (mem. op.) (holding evidence relevant to care, control, and possession for section 102.003(a)(9) standing purposes was also relevant to rebut the parental presumption on conservatorship and that material question of fact therefore precluded granting of plea to the jurisdiction), *with In re P.W.*, No. 05-16-00524-CV, 2017 WL 3587096, at \*1 (Tex. App.—Dallas Tex. App. Aug. 21, 2017, no pet.) (mem. op.) (holding jurisdictional facts under section 102.003(a)(9) did not implicate the conservatorship merits and reviewing findings for legal and factual sufficiency). This is perhaps due to differences in those particular cases.

In *In re H.S.*, however, the supreme court addressed many of the same issues pertaining to standing that are involved in the present case. The *H.S.* court implicitly, if not explicitly, held that jurisdictional issues and facts under section 102.003(a)(9) did not implicate the merits. The *H.S.* majority addressed whether the trial court's fact findings were supported by evidence, which it would not have done unless it concluded the jurisdictional issues were not intertwined with the merits. 550 S.W.3d at 155; *see also id.* at 165–66 & n.15–17 (Guzman, J.,

5

dissenting) (explaining that it would have been improper for the trial court to make findings of fact or for the appellate courts to consider them if the jurisdictional facts implicated the merits). The dissenting opinions also addressed the sufficiency of the evidence to support the trial court's findings. *See id.* at 167 (Blacklock, J., dissenting) ("We should review these findings of fact under a deferential legal sufficiency standard."); *id.* at 166 & n.21. In this case, we will follow the supreme court's lead and conclude the jurisdictional issues are not intertwined with the merits of the claims; thus, the trial court court's fact findings may be challenged on appeal for legal and factual sufficiency. *See Vernco Constr.*, 460 S.W.3d at 149; *Prewett*, 2019 WL 6974993, at *2; *Poindexter*, 306 S.W.3d at 806–07.

When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). In reviewing the factual sufficiency of the evidence, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The factfinder is the sole judge of witness credibility and the weight to be given testimony. *Keller*, 168 S.W.3d at 819.

### *The Findings of Fact*

It was undisputed that T.G.L. and Lott lived with Reyes for longer than the minimum period required for standing under section 102.003(a)(9) and that Reyes

6

filed his SAPCR petition by the statutory deadline. Among its fact findings relevant to standing under section 102.003(a)(9), the trial court determined that at all times, T.G.L. lived with Lott. The court further found that at all relevant times, Lott chose and provided for T.G.L.'s daycare; provided T.G.L.'s clothing; arranged with T.G.L.'s maternal grandfather to provide health insurance; made and accompanied the child to all medical appointments; provided day to day care; made all decisions regarding the child; managed and directed T.G.L.'s activities; provided care when needed at night; and decided what time T.G.L. got up, went to bed, how much TV she watched, whether she got dessert, and whether she went to the doctor. The trial court also found that Lott provided the child's food when they lived with Reyes, even going to a food pantry when necessary. Among its conclusions of law, the trial court held that Reyes did not have actual care, control, and possession of T.G.L. for at least six months and therefore did not have standing to file the SAPCR.

### *The Evidence*

At the hearing, Lott emphasized that she paid for T.G.L.'s daycare and was usually the one to drop her off and pick her up, but she said Reyes occasionally picked up the child when Lott had to work and asked him to do so. Lott acknowledged that she occasionally left T.G.L. in Reyes's care but said it was never overnight or for more than eight hours at a time. Lott explained that she arranged for T.G.L. to have health insurance coverage through Lott's father's insurance policy and asserted she always paid the copayment. She said that Reyes may have accompanied them to the doctor once or twice in approximately 30 visits, but he never took T.G.L. to the doctor without Lott. Lott insisted that she always got up with T.G.L. when the child woke at night and Reyes never did and she was in charge of potty training, switching T.G.L. to formula and then to solid

7

food, whether T.G.L. went to daycare, when T.G.L. got up and when she went to bed, how much TV she got to watch, and whether she got dessert. Lott also said she was in charge of disciplining T.G.L. Lott denied that Reyes regularly gave T.G.L. baths, took her on outings without Lott, or took time off work to stay with T.G.L., but she acknowledged that he referred to T.G.L. as his daughter, always paid their rent, babysat T.G.L. on Wednesday nights when Lott was in school, and would provide food on rare occasions. Lott said that she generally provided their food and even used government food programs when necessary. Lott further explained that Reyes always worked but she did not. She denied that Reyes gave her money when she needed it and said she instead got money from her parents when necessary.

Reyes testified that he acted as a father figure to T.G.L. from when she first moved in with him and that he provided financial support to T.G.L., including paying the rent and utilities wherever they lived, regularly paying for groceries, and occasionally giving Lott money for insurance copayments when T.G.L. went to the doctor. Reyes acknowledged, however, that he did not pay for T.G.L.'s daycare.

Reyes recounted that T.G.L. calls him "dada," and, in fact, it was one of her first words. Reyes explained that Lott referred to him as T.G.L.'s father and encouraged the girl to call him "dad." Reyes refers to T.G.L. as his daughter, and both he and Lott told their friends that he was T.G.L.'s father. Lott even bragged to people about how good Reyes was with T.G.L.

Reyes further testified that he and T.G.L. did things together without Lott. He took some sick leave that he had accumulated and stayed home with T.G.L. when Lott was having difficulty paying for daycare. He would babysit her all day, and they would go to the park and to an ice cream parlor and sometimes meet

8

Reyes's father for lunch. Reyes said his time with T.G.L. increased from there, whenever Lott needed to attend orientation for school or just needed a break.

Reyes also maintained that he participated in T.G.L.'s day-to-day upbringing, including bathing and feeding her, taking her to and picking her up from daycare, and putting her to bed. He would read to her at night, and they had a winking game they would play that helped her get sleepy. Reyes said that he and Lott worked in unison on potty training T.G.L. and that he had researched the topic to guide them.

Reyes denied that he only took care of T.G.L. one night a week when Lott was in school. He asserted that it was typically three to four nights a week but increased when Lott was taking classes and in the later stages of her second pregnancy, to the point where it was pretty much every night.

Reyes insisted that he considers T.G.L. to be his daughter as much as he does his biological daughter, C.R.R. He feels that they have a father-daughter relationship; she runs to him and wants to be picked up by him when she sees him, and she clings to him when they must part after a visit. T.G.L. also has a relationship with Reyes's family; she calls his father "papa" and considers his parents to be her grandparents. Reyes also introduced photographs into evidence showing him with T.G.L. and Lott.

Reyes acknowledged, however, that while he would make suggestions to Lott regarding the parenting of T.G.L. and expressed concern when he did not agree with a decision she made, Lott would often "overrule" him. He said that he could not force Lott to do anything and was not the kind of person who would anyway. As Reyes put it: "Once Holly would make a decision[,] instead of fighting her on the decisions I would go ahead and participate in what—what she wanted done."

9

Reyes's father, Fernando Reyes, testified that Reyes's relationship with T.G.L. was no different than that between a biological father and child. She clings to him, lights up when she sees him, and calls him "dada." Fernando further said that his son treats both of his girls the same. Fernando asserted he had personally observed Reyes bathe, change, feed, and otherwise take care of T.G.L. Reyes also nurtured T.G.L. emotionally.

*Analysis*

As discussed above, in order to demonstrate standing under section 102.003(a)(9), Reyes needed to show actual possession, care, and control of T.G.L., *i.e.*, that over a six-month period, he served in a parent-like role to T.G.L. by (1) sharing a principal residence with her, (2) providing for her daily physical and psychological needs, and (3) exercising the guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents. *See In re H.S.*, 550 S.W.3d at 159–60. The determination turns in large part on whether Reyes consistently made the kinds of day-to-day efforts and decisions associated with raising a child. *See id.* at 163; *In re Ramirez*, 2021 WL 1991269, at *4.

The evidence clearly establishes Reyes shared a principal residence with T.G.L. for over six months, and the trial court did not find otherwise. Thus, Reyes likely established he had the requisite actual possession of T.G.L.

The record also demonstrates that to some extent, at least, Reyes took care of T.G.L. When a nonparent takes daily responsibility for ensuring a child is fed, clothed, and emotionally nurtured, that nonparent is taking "actual care" of the child. *H.S.*, 550 S.W.3d at 158. Reyes testified at length regarding his care for T.G.L., and Lott acknowledged that Reyes did help from time to time and paid their rent. In her testimony, however, Lott minimized Reyes's role, stating that she paid for T.G.L.'s daycare and medical visits and most of their food and that she

10

usually dropped T.G.L. off and picked her up from daycare, took her to the doctor, and got up with her at night when necessary. As factfinder, the trial court was sole judge of the witnesses' credibility and the weight to be given their testimony and could accept Lott's testimony over that of Reyes and his father. *See Keller*, 168 S.W.3d at 819.

The bigger problem for Reyes on this record, however, concerns whether he demonstrated he had actual control of T.G.L. When a nonparent consistently makes the kinds of day-to-day decisions associated with raising a child, such as when the child gets up and goes to bed, how much television she watches, whether she gets dessert, when she needs to go to the doctor, that nonparent is exercising "actual control" over the child. *H.S.*, 550 S.W.3d at 158. Reyes offered little in the way of evidence that he made day-to-day decisions regarding T.G.L. Indeed, he acknowledged that while he made suggestions and expressed concern when he did not agree with Lott's decisions regarding T.G.L., rather than arguing with Lott, he would "participate in what . . . she wanted done." In her testimony, Lott insisted that she always made T.G.L.'s doctor appointments and she decided when T.G.L. switched to formula and then to solid food, whether T.G.L. went to daycare, when T.G.L. got up and when she went to bed, how much TV she got to watch, and whether she got dessert. Lott also stated that she was in charge of disciplining T.G.L. and potty training her. Except as to potty training, which he asserted was a joint effort, Reyes did not dispute any of Lott's claims regarding actual control of T.G.L.

On this record, the trial court's relevant findings and conclusion that Reyes did not demonstrate he had actual control over T.G.L. is supported by legally and factually sufficient evidence. Accordingly, the trial court did not err in granting Lott's motion to dismiss and dismissing Reyes's SAPCR for want of jurisdiction.

11

*See Vernco Constr.*, 460 S.W.3d at 149; *Prewett*, 2019 WL 6974993, at *2; *Poindexter*, 306 S.W.3d at 806–07. We overrule Reyes's first issue.

### *The Parental Presumption and Best Interest*

In his second issue, Reyes contends that the trial court erred by relying on the "parental presumption" and "best interest" standards in making the standing determination under section 102.003(a)(9). While these concepts apply to conservatorship issues when raised in a SAPCR filed pursuant to section 102.003(a)(9), they are not relevant to the question of standing under that section. *See In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020); *In re H.S.*, 550 S.W.3d at 155-60.

In support of his contention that the trial court improperly relied on these concepts in determining standing under section 102.003(a)(9), Reyes cites several of the court's fact findings. The cited findings, however, all appear to pertain to the trial court's consideration of standing under Family Code section 102.004, which Reyes asserted as an alternative to standing under section 102.003(a)(9). Section 102.004 provides standing to certain individuals when the child's present circumstances would significantly impair her physical health or emotional development. We find no support in the record for the contention that the trial court applied the wrong standards of review in considering standing under section 102.003(a)(9). Accordingly, we overrule Reyes's second issue.

We affirm the trial court's final order.


/s/     Frances Bourliot
Justice

Panel consists of Justices Bourliot, Zimmerer, and Spain.

12