

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-23-00087-CV |
| IN THE INTEREST OF | § | Appeal from the |
| R.W.N.R., | § | 90th Judicial District Court |
| a Child. | § | of Stephens County, Texas |
| | § | (TC# CV32590) |

## DISSENTING OPINION

Relying on *In re C.J.C.*, 603 S.W.3d 804, 817 (Tex. 2020), the majority concludes the trial court abused its discretion in appointing Tamara and Hope as joint managing conservators of R.W.N.R., with Tamara designated as the conservator with the exclusive right to designate the child's primary residence. Because I view *In re C.J.C.* as factually and procedurally distinguishable, I disagree.

**I.**

For several years prior to trial, Tamara exercised actual care, custody, and control of R.W.N.R., on a daily basis, and without Hope's actual presence or involvement. Only as of January 2020 did Hope exercise supervised visitation with R.W.N.R. based on agreed temporary orders. Tamara thus requested and was granted general standing to seek joint managing conservatorship

of R.W.N.R. due to her continuous exercise of a parent-like role. *See* TEX. FAM. CODE ANN. § 102.003(a)(9).

As a general standing provision, this provision allows a nonparent to file an original suit affecting the parent-child relationship when the nonparent "had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." *See* TEX. FAM. CODE ANN. § 102.003(a)(9). Following a trial, the court specifically determined that R.W.N.R. was living with Tamara at least 6 months preceding her appearance in the case as required by § 102.003(a)(9). It also determined that she provided R.W.N.R.'s care "with her providing daily physical and psychological needs, and [she] exercised guidance, governance, and direction similar to that typically exercised on a day-to-day basis by parents."

Hope never contested Tamara's status as having actual care, control, and possession of R.W.N.R. . Moreover, the majority does not substantively address Tamara's parent-like status nor address its full impact on the analysis. Rather, the majority simply states that, even though Tamara has "undoubtedly served the role of a parent to R.N.W.R.," it otherwise concludes there was no evidence to suggest that Hope was presently unfit. This conclusion assumes that a party who has established standing as a child's actual parent under § 102.003 of the Family Code is nonetheless required to overcome a fit-parent presumption in the same manner as currently required of a nonparent who has not been expressly granted general standing. Based on the plain language of the standing provision, and the constitutional implications of it as explained in *Interest of H.S.*, 550 S.W.3d 151, 161 (Tex. 2028), I disagree.

By its plain text, the general standing provision does not include a requirement to overcome a presumption of fitness as is required by other provisions. *See* TEX. FAM. CODE ANN. § 102.003(a)(9) (providing general standing to a person who has had actual care, control, and

2

possession of the child for the requisite period who is not a foster parent); *but see* TEX. FAM. CODE ANN. § 102.004(a) (stating a grandparent may file suit requesting managing conservatorship if there is satisfactory proof that the relief "is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development").

Addressing the constitutional implications of nonparent standing, the Supreme Court of Texas confirmed it "does not unconstitutionally interfere with parents' fundamental liberty interest in raising their children." *In Interest of H.S.*, 550 S.W.3d at 163. Rather, it found "the nonparent standing threshold in Texas is . . . much higher and narrower than the one rejected in *Troxel*." *Id*. at 162. Instead, once standing is established under § 102.003(a)(9), "the merits of a SAPCR petition are governed by other statutes that contain additional safeguards." *Id*. (citing, *e.g.*, TEX. FAM. CODE ANN. § 153.131)(providing that the appointment of the parent or parents as managing conservators is in the child's best interest unless the court finds that the appointment "would significantly impair the child's physical health or emotional development"). When properly construed, § 102.003(a)(9) recognizes the distinction between ordinary third parties and those "who have played an unusual and significant parent-like role in a child's life." *Id*. Ultimately, the Supreme Court observed that "the Family Code recognizes that a narrow class of nonparents, who have served in a parent-like role to a child over an extended period of time, may come to court and seek to preserve that relationship, over a parent's objections." *Id*. at 163.

In *In re C.J.C.*, Justice Lehrmann noted in her concurring opinion that the Supreme Court was not presented with the opportunity to evaluate the propriety of an award of conservatorship under § 102.003(a)(9) in light of the fit-parent presumption. 603 S.W.3d at 823. Thus, she cautioned that the "question of the degree of evidence necessary to overcome the presumption that a fit parent's decisions are in the best interest of the child when a nonparent who has acted in a

parent-like role seeks visitation remains unanswered." *Id.* at 823–24 (Lehrmann, J. concurring) (citing *Troxel*, 530 U.S. at 73 (recognizing that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied")). Nevertheless, the Court observed in *In the Interest of H.S.*, that "[p]arental rights are fundamental, but neither the Texas Family Code nor the Constitution treats them as plenary and unchecked." 550 S.W.3d at 163.

Here, the record is clear that Tamara was not merely seeking grandparent visitation over an objection from the child's biological mother. *See* TEX. FAM. CODE ANN. § 153.433(a) (creating a cause of action for a biological or adoptive grandparent seeking reasonable possession or access to their grandchild over the objection of the custodial parent). Rather, Tamara sought managing conservatorship based on the fact that R.W.N.R. had lived exclusively with her since May 2019, and she exercised actual care, control, and possession of him during that continuous period. Moreover, during the pendency of the case, her primary role in caring for R.W.N.R. continued uninterrupted while the temporary order restricted Hope to supervised visitation only.

On this record, Tamara assumed the parental role and requested conservatorship as a de facto parent. *See Troxel*, 530 U.S. at 100–01 (noting that "a fit parent's right vis-à-vis a complete stranger is one thing; her right vis-à-vis another parent or a *de facto* parent may be another"). Thus, her position differs significantly from that of a nonparent seeking conservatorship or possession and access without having the same statutory-based standing. *See, e.g.*, *In re C.J.C.*, 603 S.W.3d at 809 (nonparent stepfather seeks conservatorship asserting he cared for the child along with the biological mother while she was alive); *Interest of A.V.*, No. 05-20-00966-CV, 2022 WL 2763355, at *1–2 (Tex. App.—Dallas July 15, 2022, no pet.) (grandparents seeking conservatorship because the child lived with them on occasion and sometimes with mother). These cases do not address the situation of when a party is requesting conservatorship through § 102.003(a)(9) and whether the

4

fit-parent presumption is applicable. Rather, each note that the question remains unanswered. *See In re C.J.C.*, 603 S.W.3d at 809 (stating the issue is not before the court); *Interest of A.V.*, 2022 WL 2763355, at \*9 (remanding the case to the trial court noting "Grandparents' failure to overcome the fit-parent presumption and the statutory parental presumption does not deprive them of standing to be considered for conservatorship or access" through § 102.003(a)(9)).

Because the standing provision on which Tamara relies does not require her to additionally establish Hope's lack of fitness, I see no legal basis to apply it. Rather, the merits of both Tamara's and Hope's SAPCR petitions are governed by § 153.131 of the Family Code. *In the Interest of H.S.*, 550 S.W.3d at 162. Following that provision, I would conclude the evidence at trial was legally and factually sufficient to support the trial court's appointment of Tamara and Hope as joint managing conservators and with Tamara appointed the conservator with the exclusive right to designate the primary residence of the child.

Here, R.W.N.R.'s counselor testified she began her work with R.W.N.R. in October 2018, when his father faced criminal charges and R.W.N.R. needed therapeutic help. She testified that when Hope left R.W.N.R. in his father's care, he suffered a "huge setback" in his abandonment schema and part of his detachment disorder. The counselor described R.W.N.R.'s diagnosis as a generalized anxiety disorder with an adjustment disorder. This included food aversion and other behavioral issues. She described he was not adjusting well to rapid change and instability.

After his father was incarcerated, R.W.N.R. began living exclusively with Tamara who had been living next door to the family's home. When describing R.W.N.R.'s relationship with Tamara, the counselor described that she had observed they were very bonded, as he was very attached to his grandmother. Tamara was participating actively in his counseling and treatment

plans. She described the consistency of care in Tamara's home, pointing out that she was invested in his treatment plan.

She also testified to her concerns for R.W.N.R. when he visited with Hope in light of his ongoing treatment. She described that after his last visit, R.W.N.R. became increasingly anxious. She testified he faced food punishments with Hope. Specifically, Hope and her aunt would serve him more food than he could eat, and he was only allowed to eat when sitting at the table. When he did not eat as much as they thought he should, he reported that he was placed in time out for up to two hours in one instance. There was also yelling and arguments around food. Given how his anxiety manifested in food aversion, the counselor opined that R.W.N.R. needed consistent planning around meals.

Finally, the counselor reiterated it was important for R.W.N.R. to stay with the caregiver he had bonded with and feels most comfortable with and where he has formed school and church attachments. She opined it was important to maintain stability and keep his bonds and attachments in place while he worked to overcome his anxiety and other disorders. For these reasons, the counselor opined that it would create a significant risk to R.W.N.R.'s emotional and physical development if his primary residency was significantly changed. She was concerned for his mental and physical well-being because, if his food aversion continued in the direction it had been progressing, he would continue to lose weight and his physical health would deteriorate. She also described that his anxiety would worsen, which disrupted cognitive abilities needed for school. After reviewing the record in its entirety, I would conclude there was sufficient evidence presented to support the trial court's ruling and no abuse of discretion was shown. Because the Court concludes otherwise, I respectfully dissent.

GINA M. PALAFOX, Justice

October 25, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.