In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00270-CV**
_____

**IN THE INTEREST OF B.A.B. AND T.G.K.**

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 21-06-08302-CV

**MEMORANDUM OPINION**

*Brenda* seeks to overturn the trial court's final order terminating

her parental rights to her children, *Brett* and *Kendall.*[1] The parties tried

the case to the bench. On appeal, Brenda argues the evidence is legally

and factually insufficient to support the trial court's findings that

terminating her parental rights is in her children's best interest.[2]

---

[1]We use pseudonyms to protect the minors' identities. Tex. R. App.
P. 9.8 (Protection of Minor's Identity in Parental-Rights Termination
Cases).
[2]*See* Tex. Fam. Code Ann. § 161.001(b) (authorizing courts to
terminate the parent-child relationship on a predicate finding on one or

We conclude the evidence is legally and factually sufficient to support the trial court's best-interest findings. For the reasons explained below, we will affirm.

Background

In June 2021, the Department of Family and Protective Services filed a Petition to terminate Brenda's parental rights on seven grounds, ground that included allegations that Brenda had endangered her children.[3] The Department's petition was supported by an affidavit signed by a Child Protective Specialist for the Department. The supporting affidavit explained that based on a referral the Department received in March 2021, the Department opened an investigation to determine whether Brenda was properly caring for and supervising her children based on concerns that Brenda was using methamphetamine. According to the Specialist's affidavit, Brenda told him in his investigation she had used meth in the past. And she said she had been diagnosed with manic bipolar disorder, anxiety, and schizophrenia. Brenda agreed to an in-home safety plan for her children, and she agreed

_____

more of the grounds listed in section 161.001(b)(1) when a finding in section 161.001(b)(1) is coupled with a best-interest finding under section 161.001(b)2).

[3] *Id.* § 161.001(b)(1)(D), (E), (F), (K), (N), (O), (P).

2

to be tested for illicit drugs. The Specialist goes on to state that the results of the tests were positive for marijuana and negative for meth.

The affidavit then explained what transpired over the course of the next four months. We mention only a few of those details here. The Specialist's affidavit reveals that Brenda's ability to provide suitable housing for herself and her children became increasingly unstable between May and June 2021. By late May 2021, Brenda and her children were living in the Montgomery County Women's Center. On June 3, 2021, Brenda left the Women's Center, and she left Brett and Kendall with *Daphne*, the mother of a man whom we will refer to as *Kent*, when she ended her relationship with Kent in late October or early November 2019.[4] During the investigation, the Department learned that Brenda has a criminal history, which included convictions related to meth. The Department's investigation also revealed that Brenda had a history with the Department, which began before Brett and Kendall were born. Her history involved some of Brenda's other children who had been removed from Brenda's care. According to the affidavit, those children were also

[4]In the trial, Brenda testified she lived with Kent, off and on, for the first two years of Brett's life. The Department sued Kent alleging that he was Brett's presumed father and Kendall's alleged father.

3

removed over concerns relating to Brenda's use of meth and over concerns relating to the safety of the children that the Department discovered when the Department's investigators inspected the homes where these other children were being raised.

In July 2022, the parties tried the case to the bench. Four witnesses testified in the trial: (1) Brenda; (2) Daphne; (3) Brett's and Kendall's Court Appointed Special Advocate (the CASA);  and (4) The Caseworker the Department assigned to Brett and Kendall's case in September 2021.

During the trial, Brenda testified she has a thirteen-year history of using meth. Kent was represented by appointed counsel in the trial. Based on DNA testing admitted into evidence, the trial court found that Kent "is not the father of [Brett]."[5] At trial and on appeal, she argues the evidence shows that since February 2022, she has not used illicit drugs. Still, the other three witnesses who testified said that they felt it is in the children's best interest for the court to terminate Brenda's parental rights.

---

[5]Based on the DNA test results, the trial court ordered the Vital Statistics Unit to amend Brett's birth record by removing Kent from its record as Brett's father. As to Kendall, the trial court terminated Kent's parental rights to the extent he had rights to her since Kent didn't file a claim to be Kendall's father in response to the Department's suit. Kent did not appeal from the order terminating his rights.

On appeal, Brenda argues the evidence is legally and factually insufficient to support the trial court's best-interest findings because the Department failed to introduce evidence on each of the factors that courts use to guide their decisions about whether terminating a parent's relationship with a child is in a child's best interest.[6] Except for Brenda's challenge to the trial court's best-interest finding, Brenda hasn't challenged the other findings the trial court relied on to terminate her parental rights, including its findings that Brenda placed her children in conditions or surroundings and engaged in conduct or placed her children with persons who engaged in conduct that endangered their physical or emotional well-being.[7]

---

[6]In *Holley v. Adams*, the Texas Supreme Court applied these eight nonexclusive factors in reviewing a best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the parties seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

[7]Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Standard of Review

At trial, the Department of Family and Protective Services had the burden to prove the allegations in its petition by clear and convincing evidence.[8] As defined by the Family Code, *clear and convincing evidence* "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[9] In a case tried to the bench, the trial court acts as the factfinder, determines what witnesses are credible, decides what weight to give the testimony, and is free to resolve the inconsistencies that may exist in the testimony.[10]

Under a legal-sufficiency review, we determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[11] In reviewing the evidence, we "look at all the evidence in the light most favorable to the finding," "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable

---

[8]*See In the Interest of J.W.*, 645 S.W.3d 726 (Tex. 2022); Tex. Fam. Code Ann. § 161.001(b).

[9]Tex. Fam. Code Ann. § 101.007.

[10]*See Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011); *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

[11]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[12] Still, in our review we will not disregard "undisputed facts that do not support the finding" that a party is challenging in an appeal.[13] When deciding whether a reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding challenged in an appeal, we defer to the factfinder's role as the "sole arbiter of the witnesses' credibility and demeanor" when the inferences it drew from the evidence before it were reasonable.[14]

When conducting a factual-sufficiency review, we "give due deference" to the findings that are based on the direct and circumstantial evidence admitted by the trial court in the trial.[15] In a factual sufficiency review, the question we must decide is not what we would have found from the evidence had we been seated as the factfinder.[16] Rather the question is whether from the evidence as a whole the factfinder could

---

[12]*Id.*
[13]*Id.*
[14]*In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re J.W.*, 645 S.W.3d at 741.
[15]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).
[16]*Id.*

"reasonably form a firm belief or conviction about the truth of the [Department's] allegations."[17]

On appeal, to support an argument that the evidence is factually insufficient to support a verdict, the parent challenging the verdict should explain why the factfinder could not have credited the evidence the parent challenges in favor of the finding the parent disputes.[18] A reviewing court will not find the evidence factually insufficient unless "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" in favor of its finding.[19]

When deciding whether terminating a parent's rights is in a child's best interest, the inquiry is necessarily "child-centered and focuses on the child's well-being, safety, and development."[20] Generally, when examining the evidence supporting a best-interest finding, we compare the evidence admitted in a trial against the nonexclusive factors the

---

[17]*In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[18]*See In re J.F.C.*, 96 S.W.3d at 266.
[19]*Id.* at 267.
[20]*In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

Texas Supreme Court identified in *Holley v. Adams*.[21] Yet the factors set out in *Holley* aren't exclusive, and the evidence that relates to a factfinder's normal decision-making process in finding what's in a specific child's best interest need not include evidence addressing all eight *Holley* factors.[22]

For example, when probative, evidence on any one of the more than twenty-one predicate grounds for terminating a parent's rights may provide support for a trial court's best-interest finding.[23] That's often the case when, as here, the factfinder found that the parent endangered her child. When a parent has been found to have endangered their child, the absence of evidence on one or more of the *Holley* factors generally will not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest."[24]

---

[21]*See Holley*, 544 S.W.2d at 371-72.
[22]*In re C.H.*, 89 S.W.3d at 27 (noting the lack of evidence on some *Holley* factors "would not preclude a factfinder from reasonably forming a strong belief or conviction that termination is in the child's best interest").
[23]*Id*. at 27-28.
[24]*Id*. at 27.

Analysis

In her appeal, Brenda didn't challenge the trial court's conduct and condition endangerment findings.[25] Instead, Brenda argues the evidence is insufficient to overcome the presumption that appointing a parent as a child's joint-managing conservator is in the child's best interest.[26] According to Brenda, the Department failed to overcome that presumption because it failed to introduce evidence on several of the factors the Texas Supreme Court identified in *Holley*.[27] For instance, Brenda notes there isn't any direct testimony in the record about her children's desires. Yet Brenda acknowledges the trial court heard evidence that the children are "bonded in their current placement." And Brenda notes the Department introduced testimony showing the Department's plans for the children are to have them to be adopted by a family with whom the children are not biologically related.

Brenda is also critical of the quantity of the evidence the Department introduced addressing Brett's and Kendall's emotional and

---

[25]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

[26]*Id.* § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists in keeping a child with its parents).

[27]*See Holley*, 544 S.W.2d at 371-72.

physical needs. Brenda characterizes that evidence as "scant." As Brenda tells it, the Department presented no testimony indicating her children have "special needs of any kind." Brenda argues that except for the Department's plans proposing to have her children adopted by an unrelated family, the trial court heard little other evidence about what the Department's plans are for her children, what the proposed adoptive family plans are for them, and how stable the adoptive family's home might be should her children be adopted into that home. According to Brenda, all she needs is more time to gain the skills and employment required so that she as their parent may meet her children's needs.

Finally, Brenda—who was twenty-eight-years old when the case was tried—acknowledges the trial court heard testimony showing she has struggled "with sobriety, homelessness, and was the victim of domestic abuse." Brenda downplays that testimony, describing the testimony as mostly "past events" that "occurred . . . when she was in her late teens and early twenties." Brenda distances herself further from her own choices by claiming she asked for help from members of her family "to remedy these shortcomings[,]" noting there is evidence showing she arranged to have members of her family take care of her children during periods she could not. Although Brenda didn't identify the members of

11

her family she referred to in her brief, the evidence before the trial court shows she left Brett and Kendall with Daphne who testified that Brenda made choices that did not allow her children to have a safe home. The DNA testing also established that Kent is not Brett's biological father, and there is scant evidence in the record that Kent is Kendall's biological father.[28] So while Daphne testified that she is Brett's and Kendall's paternal stepmother, the evidence in the record proves she is not biologically related to Brett, and the record contains scant evidence to prove she is biologically related to Kendall. Despite all that, Brenda testified she trusted Daphne, Brett and Kendall are bonded to Daphne, and Daphne has provided the children with competent care.

In her brief, Brenda points to the evidence that favors the finding she wanted but didn't obtain while she ignores and minimizes the evidence the trial court could have reasonably credited in finding that

---

[28]When the Department's attorney asked Brenda whether Kent was Kendall's father, she said: "I don't know the correct term. Alleged father." Later, Brenda testified that Kent told her he was claiming he was Kendall's father. Kent didn't testify in the trial. That said, Brenda testified there were two other men, whom she named, who she thought could be Kendall's father. No DNA test results were admitted or offered into evidence addressing whether Kent is Kendall's biological father. Kent was represented in the trial by appointed counsel, but there is no answer for him in the Clerk's Record we have before us in the appeal.

terminating her relationship is in her children's best interest. As a reviewing court, we "look at all the evidence in the light most favorable" to the trial court's finding, and we don't look at the evidence in the light that Brenda has favoring the finding she asked for in the trial.[29] So while we concede the record doesn't contain testimony that addresses each of the *Holley* factors, that's not what *Holley* required.[30] In explaining what quantum of evidence *Holley* requires, we have repeatedly stated: "No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in a child's best interest."[31]

As already mentioned, the trial court's findings that Brenda endangered her children are undisputed. In her brief, Brenda hasn't explained why the trial court's endangerment findings alone don't offer sufficient support for the trial court's finding that terminating her

---

[29] *In re J.F.C.*, 96 S.W.3d at 266.

[30] *See In re C.H.*, 89 S.W.3d at 27.

[31] *In re K.F. & K.*, No. 09-21-00078-CV, 2021 Tex. App. LEXIS 7067, at *17 (Tex. App.—Beaumont Aug. 26, 2021, no pet.); *In re B.S.*, No. 09-21-00080-CV, 2021 Tex. App. LEXIS 6629, at *13 (Tex. App.—Beaumont Aug. 12, 2021, no pet.); *In re B.P.*, No. 09-21-00038-CV, 2021 Tex. App. LEXIS 5000, at *14 (Tex. App.—Beaumont June 24, 2021, no pet.); *Interest of J.S.*, No. 09-20-00294-CV, 2021 Tex. App. LEXIS 4574, at *32 (Tex. App.—Beaumont June 10, 2021, no pet.).

parental rights is in their best interest. The trial court could have reasonably concluded that terminating Brenda's parental rights was required to prevent Brenda from endangering her children again, based on her historic patterns of addiction.[32]

By Brenda's own account, she has a thirteen-year history of using meth. Brenda's testimony shows she has unsuccessfully tried to stop using meth more than once. In 2018, after Brenda quit using meth when she was pregnant with Brett, Brenda started using meth again. She started again, she said, because she became "depressed because [she] did not have [her] son." The trial court also heard Brenda testify that Kent used meth in their home after Brett was born. According to Brenda, she stopped using meth again when she found out she was pregnant with Kendall. But Brenda explained she began using meth again following Kendall's birth, dating her sobriety to February 2022. In February 2022, Kendall would have been about two-years old. And by dating her sobriety to February 2022, the trial court could also have inferred that Brenda used meth at times even after the Department sued her in June 2021 and asked the trial court to terminate her parental rights.

---

[32]*In re C.H.*, 89 S.W.3d at 27.

The Caseworker for the Department testified that terminating Brenda's parental rights would, in her opinion, be in Brett's and Kendall's best interest. According to the Caseworker, the Department's current plans are for the children to be adopted by nonrelatives. Currently, a family is visiting with the children who is interested in adopting them under a plan that targets having the children with the adoptive family and enrolled in school in the fall. The Caseworker based her opinion about terminating Brenda's parental rights on Brenda's history of substance abuse, Brenda's account that "she has a mental health disorder [] for which she is not seeking or following treatment[,]" and Brenda's lack of "contact with her children from October of 2021 until June of 2022."[33]

As for Brenda's mental disorder, Brenda testified that the doctors she saw when she was jailed in 2022 prescribed lithium to treat her bipolar disorder. Brenda explained that she was supposed to seek further medical care for that condition after she was released. Brenda claims she

---

[33]During the trial, Brenda testified she was diagnosed as bipolar. Further, Brenda testified she believes she has schizophrenia, and she based her opinion on feelings she sometimes has that she believes "people are out to get [her] or are "trying to harm [her]." Brenda attributed her symptoms to her historical use of meth.

15

followed up on the medical advice she received when she was released from jail by seeking treatment at the Legacy Center, a facility that offers spiritual counseling but that has no licensed professionals or doctors who could have refilled the prescription Brenda was given to treat her for bipolar disorder, a disorder she had been diagnosed as having by the mental health facility serving Montgomery County. Even though Brenda explained she didn't seek or obtain treatment from a psychiatrist or psychologist, she said that during the thirty-day period before trial, she had been "doing good without medication." Based on the way she was coping with her problems with the skills she had developed at the Legacy Center, Brenda explained she didn't plan to take any medications unless "the Court believes that it's medically necessary . . . for the well-being of [her] children."[34]

The trial court also heard from Daphne, who probably knew Brenda better than any of the other witnesses who testified because she had known Brenda for six years. Daphne testified that she has had Brett in her home since he was about nine-months old. Daphne explained she has had Kendall in her home since June 1, 2021. The children were five-years

---

[34]No one introduced Brenda's medical records into evidence, including the records from the Legacy Center.

16

old and two-years old when the case was tried. Daphne explained she met Brenda when Brenda began dating Kent. Daphne based her opinion about terminating Brenda's parental rights on her experience with Brenda over the last six years. Based on that experience, Daphne testified she thought Brenda's rights should be terminated because Brenda makes bad choices, choices that make it dangerous for children to live with Brenda in Brenda's home. According to Daphne, Brett and Kendall are now "doing great" in her home, and they are doing much better than when they lived with Brenda.

The evidence before the trial court includes records proving that Brenda has prior criminal convictions, two of which are for possession of meth.[35] Given the exhibits evidencing Brenda's convictions, the trial court could have reasonably determined that Brenda's convictions

---

[35]The trial court admitted the following Judgments of Conviction into evidence: (1) a conviction for Class A misdemeanor theft, for an offense in June 2021; (2) a conviction on a State Jail Felony for possession of a controlled substance—methamphetamine in an amount of less than 1 gram—for an offense in December 2018; (3) a conviction on a State Jail Felony for possession of a controlled substance—methamphetamine in an amount of less than 1 gram—for an offense in February 2016; and (4) a conviction for a Class B misdemeanor DWI, based on a date of offense of February 2014.

exposed Brenda to the possibility of an enhanced punishment were Brenda to be convicted of additional crimes.

To sum it up: Brenda didn't challenge the trial court's condition or endangerment findings. In our review of Brenda's appeal, we must defer to the trial court's endangerment findings because the record contains evidence supporting the findings.[36]

Evidence showing that (1) three witnesses expressed lay opinions that terminating Brenda's parental rights is in her children's best interest, (2) Brenda used meth for thirteen years, (3) Brenda continued using meth after the Department filed suit, (4) Brenda didn't prove she has the ability to provide her children with a safe, stable and drug-free home, (5) Brenda failed to comply with her family service plan, (6) Brenda knowingly placed or allowed her children to remain in conditions or surrounding that endangered their physical or emotional well-being, and that (7) Brenda engaged or placed her children with persons who engaged in conduct that endangered their physical or emotional well-being is

---

[36]*See In the Interest of H.S.*, 550 S.W.3d 151, 155 (Tex. 2018); *In the Interest of B.A.*, No. 09-20-00216-CV, 2021 Tex. App. LEXIS 2506, at *25 (Tex. App.—Beaumont Apr. 1, 2021, no pet. h.); *In the Interest of R.M.S.*, No. 09-19-00011-CV, 2019 Tex. App. LEXIS 5390, at *2-3 (Tex. App.—Beaumont June 27, 2019, pet. denied).

evidence that supports the trial court's finding that terminating Brenda's parental rights is in Brett's and Kendall's best interest.[37] Even if the trial court believed Brenda's testimony that she remained drug free in the six-month period before the trial, the trial court still had the right on this record to infer that Brenda couldn't provide her children a safe and stable home free from the danger that Brenda would return to her historical patterns of using an illegal drug based on the evidence of her past conduct, evidence that was undisputed in the trial.

While Brenda focuses on the presumption that keeping a child with the child's parent is in the child's best interest, it is equally presumed that "the prompt and permanent placement of the child in a safe environment . . . is in the child's best interest."[38] Given Brenda's historical use of an illegal substance when compared to the length of time Brenda admits she has gained an awareness that her problem is serious, the trial court could reasonably infer that even if she is now in temporary

---

[37]*See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re B.P.*, No. 09-21-00038-CV, 2021 Tex. App. LEXIS 5000, at *10 (Tex. App.—Beaumont June 24, 2021, no pet.) (explaining the factfinder may infer from a parent's past conduct endangering the child that similar conduct will recur if the child were to be returned to the parent).

[38]Tex. Fam. Code Ann. § 264.307(a).

remission, Brenda's addiction creates a condition that makes terminating her parental rights in her children's best interests. Because the evidence is legally and factually sufficient to support the trial court's best-interest findings, we overrule Brenda's sole issue.

## Conclusion

Deferring to the trial court's role as the sole arbiter of the facts, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings. The trial court's Order of Termination is AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on November 21, 2022
Opinion Delivered February 2, 2023

Before Golemon, C.J., Horton and Johnson, JJ.