

# NUMBER 13-23-00006-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE DUSTIN ESTEP

## On Petition for Writ of Mandamus.

## MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Longoria and Silva
### Memorandum Opinion by Chief Justice Contreras[1]

Relator Dustin Estep filed a petition for writ of mandamus asserting that the trial court abused its discretion by issuing temporary orders concluding that his daughter A.F.L.'s grandparents have standing, appointing them as temporary joint managing conservators, giving them the exclusive right to designate A.F.L.'s primary residence without regard to geographic area, and giving Dustin limited possession and access. We

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *id.* R. 47.1 (requiring the appellate courts to "hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition"); *id.* R. 47.4 (distinguishing opinions and memorandum opinions).

conditionally grant the petition for writ of mandamus in part and deny it in part.

## I.    BACKGROUND

On May 3, 2022, Carl Raymond Lewis filed an original petition in a suit affecting the parent-child relationship regarding his granddaughter, A.F.L. who was born on June 23, 2021. In terms of standing, Carl alleged that A.F.L. had lived with him for six or more months. *See* TEX. FAM. CODE ANN. § 102.003(a)(9). As respondents, he named his daughter, A.F.L.'s mother, Briana Nicole Lewis, and "alleged father," Dustin. Carl suggested that he be appointed as nonparent sole managing conservator of A.F.L. Carl alleged that he was concerned about A.F.L.'s safety with both parents and asked for them to have limited visitation with A.F.L. As an exhibit to his petition, Carl attached a December 30, 2021 statement provided by Briana. In the statement, Briana alleged that she was A.F.L.'s mother and that she was giving "temporary custody" of A.F.L. to her parents, Maria Dolores Lewis and Carl Raymond Lewis (grandparents). Briana's statement ostensibly gave the grandparents "full legal rights" to provide A.F.L. with any necessary medical care and to enroll her in daycare or preschool. This statement also provided that Carl and Maria would have the same rights regarding Briana's older daughter, K.N.W., who was born on June 28, 2019, and who is not at issue in this original proceeding.

On May 6, 2022, Carl and Maria filed an amended petition, again asserting standing based on A.F.L.'s residence with them for six or more months. The amended petition sought to have them both appointed as nonparent sole managing conservators, and again stated that there was a concern about A.F.L.'s safety and asked for limited possession for Briana and Dustin in the form of supervised day visits. The grandparents requested that Briana and Dustin be ordered not to use alcohol or illegal drugs twenty-

2

four hours prior to or during possession.

On May 9, 2022, the trial court signed a temporary order appointing Carl and Maria as nonparent sole managing conservators. The order states that Dustin's paternity had not been established and does not reflect that either Briana or Dustin had appeared in the case or filed any pleadings.

On May 19, 2022, Briana filed a statement with the court through which she alleged that:

> My name is [Briana] and I am requesting that the petition that was filed against me be overturned due to the fact that my daughter, [A.F.L.], has not been living with my parents, [Carl] and [Maria], for more than six months. She has only been living with them without my presence since the beginning of 2022. [A.F.L.] is at the age of 11 months, a time in which she is at a developing stage in her life, [and] as a mother I plan to provide a loving environment for her, along with her father. A child's development is dependent on the involvement and support of both parents. I, [Briana], and the father, [Dustin], are both united in providing [A.F.L.] with a loving home and a supportive family structure. Dustin has privately acquired a DNA test which has proven that he is the father, but it may not be admissible by the court. If I, [Briana], absolutely must, [I] will request a court ordered DNA test to prove without question that he is the father of [A.F.L.] so that he will have legal rights to see our daughter.

On May 19, 2022, the trial court signed an order stating that the May 9, 2022 temporary order was "inadvertently signed," voided the earlier order, and set an emergency hearing for May 26, 2022.

At the status hearing held on May 26, 2022, the parties all appeared pro se.[2] The trial court explained that the May 9, 2022 order was improperly signed and apologized to the parties for the error. Maria explained to the court that she and Carl were seeking

---

[2] As will be discussed further, the trial court held status hearings during the pendency of these proceedings on May 26, 2022, August 1, 2022, October 24, 2022, August 31, 2022, and November 29, 2022. The trial court administered the oath to witnesses and took sworn testimony on August 1, 2022 and November 29, 2022. The remainder of the hearings included non-sworn argument by the parties.

custody of A.F.L.; that A.F.L. had been living with them for eleven months in Harlingen; and that Briana had not been living with them since the end of December.

Dustin informed the court that he had not been living with A.F.L., and that he resided in Tool, which is in Henderson County, but he had "been wanting to get custody" of his daughter. He explained that he was not designated on A.F.L.'s birth certificate as her father, and thus he had obtained a private DNA test to establish his paternity. The test, taken in March, showed that Dustin was A.F.L.'s father.

Briana told the trial court that she "would like for [her] daughter's father to be able to definitely have custody of her, so that way they could get to know each other and that way they can create a bond." She explained that she was not requesting custody.

Carl explained that Briana had given her parents power of attorney over A.F.L. in December because she "said [that] she needed to get mental help," but that she had "not attempted any kind of counseling." Carl advised the court that Dustin had known about the child since Briana was pregnant because "[t]hey were together at the time." Carl alleged that Dustin had made no effort to obtain possession of A.F.L. or get to know her. According to Carl, Dustin said that "he was not ready to be a father when she was born," but "now that he is ready, that he wants to come and get her."

Dustin informed the court that he sent Briana money for A.F.L., and that he was in contact with Briana until Carl confiscated her phone. Dustin explained that Briana subsequently contacted him on a different phone and reached out to him to ask him if he wanted custody of A.F.L.

At the conclusion of the hearing, the trial court stated that it would order a formal DNA test and noted that the attorney general would be involved in future proceedings.

4

The trial court set the next status hearing for August and gave permission for Dustin to appear by Zoom given that he resided approximately eight hours away.

On June 29, 2022, the Office of the Attorney General filed an intervention in the suit requesting the court to make orders regarding conservatorship and support for A.F.L.

On August 1, 2022, the trial court held a status hearing. The parties again appeared pro se and were joined by an amicus attorney and counsel for the attorney general. At this hearing, the trial court administered the oath to the parties in order for them to provide testimony. Maria testified that Dustin had contacted them, and she advised him to come see A.F.L. and let her get to know him; however, Dustin "cut off contact" and they had not heard from him since that time. She stated that Dustin had not contacted them since the last hearing and had not asked how A.F.L. was or if she needed anything.

Briana informed the court that she wished to give Dustin "full custody" of A.F.L.

> so that way they have a chance to create a bond with each other considering the fact that they have not had a chance to yet meet, nor has she, my daughter, had a chance to meet any of my side of the family, my mother and my great grandmother, and so on and so forth.

Briana explained that Maria was her stepmother, not her mother. Briana further explained that she had not seen A.F.L. since March and requested to spend some time with her. She explained that she had not received mental health care yet "only because [she] cannot afford it at this time." Briana explained that she had been working at a Longhorn Steakhouse since August. She informed the trial court that she had another child, a three-year-old girl, who was with that child's father, and she recently made the eight hour trip to go visit her. She acknowledged that she did not pay child support and denied using drugs.

5

Maria informed the court that Briana had not seen A.F.L. due to her own choices, and that she was welcome to visit A.F.L. at any time. Carl explained that they told Briana not to move away from their shared home, but she chose to sign the statement giving them custody and "hightailed it to her own apartment." Carl stated that, "[i]nstead of staying where she had a support system and people to help her find the help she needed, she ran." Carl advised the court that they "were getting ready to try to help [Briana] find counseling," but she did not contact them.

The trial court embarked on an endeavor to discover whether Briana needed help with a mental condition or whether it was "an excuse" so that she could "go out and party with [her] friends." Carl told the court that he "believe[d] it's just an excuse because she showed up at the house with police officers," and told them that "she no longer needed help" and that "she felt better." Maria clarified that Briana "just wanted to get the baby and take it to [Dustin]." In response to questions from the trial court, Briana stated that she believed she needed mental health treatment because she had experienced traumatic events in the past and had been trying to "save up" to obtain treatment. Briana explained that she "recently" had "been feeling a lot better" than she had in the past and had been handling matters herself.

The parties received and discussed the official paternity test, which shows that Dustin is A.F.L.'s father. The trial court reset the hearing to allow the amicus to work with the parties and allow Briana and Dustin to visit A.F.L. at her grandparents' home since she had not seen her mother in some time and because she had never met her father.

On August 31, 2022, the trial court held another status hearing. At this hearing, the amicus informed the trial court that "miscommunication" had led to the instant legal

6

proceeding. The amicus had spoken with Briana, who acknowledged that A.F.L. was doing well with her grandparents, but Briana wished for A.F.L. to be with Dustin, and Briana wanted to give Dustin "that opportunity," and the amicus agreed. According to the amicus, this plan was not communicated to the grandparents. At this point, A.F.L. had not met Dustin, so the amicus planned for a transitional period for the parties to initiate contact. The amicus explained that she had spoken with Dustin, and his mother, and they had a large familial support system. The amicus suggested that the parties meet half-way between their homes for preliminary visitation. At this point, however, Carl interjected, objecting to the visitation plan because Briana and Dustin had not contacted him, and because A.F.L. did "not do well with" meeting too many people at once. The amicus ultimately suggested having Dustin and his mother visit A.F.L. at her grandparents. The trial court informed the parties that he would "allow" Dustin to have visitation with A.F.L., but would require Dustin to travel the eight hours to do so.

On October 24, 2022, the trial court held another status hearing. The amicus informed the court that Dustin had visited A.F.L. twice since the last court date. The first time, Dustin visited with his mother, and the second time with a sister and a niece. The amicus stated that Dustin "has a big family support system"; that the visits went well according to "everybody"; and that Dustin brought toys and clothes for A.F.L. The amicus referred to difficulties in visitation due to the geographic distance between the parties, but stated

> there is nothing that I've seen of concern for dad having the child. He came down here, he brought stuff. He has his family. He has a nursery. He has a support system set up. It seems that he was not involved in the beginning. A lot of it has do to with some issues that mom's having.

7

The amicus advised the trial court that she recommended a visitation schedule that allowed mother supervised visits and provided the grandparents with access. She stated that there had been "good communication" between Dustin and the grandparents, but that "a lot of animosity" had "built up during some of the visits." She advised Dustin that, had it not been for the grandparents, A.F.L. would be in foster care. The trial court asked the parties to let him know what they wanted. Carl stated that he and Maria wanted what was best for A.F.L., and that A.F.L. would cry if separated from Maria. Carl stated, "We're not against [Dustin], it's just I don't think either one of them is really ready for her completely to be with him, considering there hasn't even been any overnight visitations."

Briana told the trial court:

I would definitely like for the dad and the baby to have a really good bond. I know that it is something that is going to take a little while, especially since he wasn't able to see her during the first year of her life. But, eventually, that is something that I would love for them to have, especially since he is the dad. And I would love to—I would love for her to grow up knowing all of her family, not just one side. She's—I know she's still young and she's got her whole life ahead of her, so it's—I think it would be best for her to—to definitely be able to meet the rest of her family and not just the family that's down here in the Valley.

The trial court asked Briana about her own relationship with A.F.L., and she stated, "It's not that I don't' want her to be with me," and "I do want that relationship with her, as well," but "I just know I'm not in the right mental state to have full custody of her at this moment."

The trial court then asked Dustin for his views, and Dustin informed the court that:

And I just want to kind of agree with everybody. We all want what's best for her. And I think it would be nice to get her early, so that way it wouldn't traumatize her as much, in a way, and she would be able to grow close to me, I would think. I would like it if she did have a relationship with all of us. We're all her family. And she does have a bunch of other family where I live at. So[,] I think it would be—I think it would be the best thing to have her

8

down there. And if they want visits, they can have visits. I wouldn't have problems with that at all. I know it's a long road that we're working at here.

At the conclusion of the hearing, the trial court told the parties that it appeared that they would need to hold a trial regarding custody because both the grandparents and Dustin wanted to obtain custody of A.F.L. The grandparents and Dustin informed the trial court that they planned to retain counsel.

On November 7, 2022, Dustin and Briana filed a counter-petition seeking custody of A.F.L. On November 23, 2022, Dustin filed an objection to the grandparents' suit for conservatorship or possession and access, requested dismissal of their suit for lack of standing, and requested temporary orders appointing Dustin and Briana as temporary joint managing conservators of A.F.L.

On November 29, 2022, the trial court held another status hearing. This time, the grandparents and Dustin were represented by counsel. The amicus advised the court that allowing the parties to agree as to visitation had not worked well because the parties had some conflicts. After hearing Dustin's arguments pertaining to standing, the trial court concluded that the "grandparents have standing," but wanted to address "the parameters of their possession and dad's access." The trial court ultimately allowed Dustin's counsel to call witnesses, and at this hearing, the parties testified under oath.

Dustin testified that he dated Briana, and he was happy that she was pregnant and was ready to be a father. However, their relationship deteriorated, and Briana moved into her mother's home. Subsequently, Briana's relationship with her mother deteriorated, and Briana moved in with Carl and Maria. Dustin told Briana that he did not want her to move in with them. He told her he would send money if she needed it, and he wanted her to

9

move back to his vicinity. He testified that he and Briana intended for Briana to move back, and they planned to co-parent.

Dustin lost contact with Briana in October of 2021. He looked for her on social media but did not find her. They did not reconnect until February of 2022 when she messaged him. Briana told him she gave temporary custody of A.F.L. to Carl and she asked if Dustin wanted custody. Dustin called Carl, who told him to get a DNA test. Dustin did so privately, and the DNA test showed that Dustin was A.F.L.'s father. Dustin told Carl that he wanted to pick up A.F.L., but Carl told him that possession had to be determined "legally." Dustin testified that he has prepared a nursery for A.F.L. and has been going to see her every couple of weeks, driving eight hours each way. According to Dustin, A.F.L.'s grandparents have not cooperated with his requests for visitation and would not allow overnight visits. Dustin testified that he works at Stewart Toyota as a lube and tire technician, his "set" pay is $1,150 every two weeks, and he can earn additional money if he works extra hours or makes sales. Dustin explained that he is seeking custody of A.F.L. because it is in her best interest. Dustin said that A.F.L. has a sister and many family members in Henderson County. Dustin stated that while he is working, his mother, sister, and stepsister can watch A.F.L.

Dustin acknowledged that A.F.L. was born in Cameron County on June 23, 2021 and has resided there since that time. Dustin did not contact Carl regarding A.F.L. until March 2022. Dustin further admitted using marijuana in the past but stated that he had stopped using marijuana six months prior to the last hearing in August. Dustin denied using any other drugs. Dustin acknowledged that A.F.L.'s grandparents had "done a good job raising her," but he was "ready to take custody of her."

10

Briana testified that she signed the December 30, 2021 statement because she was suffering from post-partum depression, so she "was not in the best state of mental health," and she asked Carl and Maria for help taking care of her children. According to Briana, she did not move out of their home until January 8, 2022. Briana believed that she asked to take back custody or possession of her children in mid-January or perhaps early February. Maria told Briana that she could not have the girls "because of the neighborhood that [Briana] lived in." After that, Briana attempted to visit the children every day, or three or four times each week. Briana testified that Carl and Maria "talked down on" her and they said "negative" things to her and about her. She thus explained that she reached out to Dustin toward the end of February or beginning of March.

Briana testified that she did not know her father and stepmother had planned to file a lawsuit seeking custody of A.F.L. until after they filed suit. She filed a response with the court around May 19, 2022. She did not agree with their request for custody. At that time, and at the time of the hearing, Briana was employed as a fry cook at Longhorn Steakhouse. Briana clarified that she does not take drugs and has not been on drugs.

Briana expressed concerns about A.F.L. living with Carl and Maria because Maria engaged in a fistfight with another woman outside of the house where she and her children were and did so in front of her minor cousins. Further, Briana explained that Maria's brother had approached her inappropriately in the past regarding developing a relationship with her. Briana expressed concern that Maria will not protect her children, and she is concerned that the people that Maria allows around A.F.L. are not appropriate. Briana testified that Carl's paternal uncle was convicted for sexually assaulting her, and Carl knew about this, and "he does not believe me."

11

Briana testified that she "[d]efinitely" wants A.F.L. to be placed with Dustin because their visitations have gone so well. Briana testified that A.F.L. was "smiling, laughing the entire time with him," and "it felt right for her to be with him." Briana further testified that, in addition to the father-daughter relationship, she also wanted Dustin to have custody of A.F.L. because A.F.L. would be much closer to her sister, K.N.W. Briana explained that K.N.W.'s father has custody of her and lives near Dustin, and Briana lives approximately twenty minutes away. If Dustin had custody of A.F.L., the sisters would only be twenty minutes apart rather than eight hours. Briana testified that she believes that it is in A.F.L.'s best interest that she live with Dustin and that they co-parent.

Briana acknowledged that she told the court at the last hearing that she was not mentally able to take care of A.F.L. and acknowledged that A.F.L. has lived with Carl "at this particular residence for almost a year now." She acknowledged that she has not consulted a doctor and is not on medication for her mental health problems. Briana further confirmed that she only intended to leave A.F.L. there temporarily, and it was not supposed to be permanent. She further confirmed that in February 2021, she gave possession of her older daughter, K.N.W., to that daughter's father.

Maria testified that when Briana gave them A.F.L., the arrangement was supposed to be temporary and that they were "helping her out taking care of the girls." She denied that Briana had asked for A.F.L. to be returned to her. She personally has no problems with Dustin and would have no objection if he were to be awarded custody. However, she was unsure whether A.F.L. could handle such a transition. Maria testified that she thought that Dustin "would have to take baby steps to get to know her more." She conceded that she denied Dustin visitations with A.F.L. She further conceded that she had "no concerns"

12

about Dustin, although she alleged that he should be subject to a drug test because she could "smell the weed" on Dustin's jacket the last time he picked A.F.L. up for visitation in November.[3] Maria admitted that she had engaged in a fistfight, as alleged by Briana, but claimed that she was defending one of her nieces from an older woman. Maria alleged that A.F.L. was crying in the middle of the night after a recent visit with Dustin. She agreed that children should be placed with fit parents over grandparents, and when asked if Dustin is a fit parent, stated that she "[does not] really know him." In terms of evidence that A.F.L. would be placed in harm physically or emotionally if she were to be placed with Dustin, Maria testified that she was concerned that Dustin might allow Briana to have possession of her. Maria denied that she ever kept Briana's children away from her and denied that Briana ever asked for custody or possession of them.

On January 4, 2023, the trial court signed temporary orders. The trial court's temporary orders: (1) conclude that the grandparents have standing to petition for conservatorship; (2) appointed Dustin, Briana, Carl, and Maria as temporary joint managing conservators; (3) gave the grandparents the right to designate the primary residence of A.F.L. without regard to geographic area; (4) allowed Dustin possession for weekend visits on the first, third, and fifth Friday of each month but required the visits to take place in Cameron County, Texas; and (5) gave the grandparents the right to possess A.F.L. at all times that are not specifically designated as periods of possession for the parents. The temporary orders did not include provisions regarding Briana's ability to possess or visit A.F.L.

---

[3] The record does not indicate whether the parties were subject to drug testing or include the results of any such testing.

13

This original proceeding ensued. Dustin raises three issues asserting that the trial court abused its discretion by: (1) entering temporary orders granting the grandparents joint managing conservatorship with Dustin and Briana and awarding the grandparents the exclusive right to designate A.F.L.'s residence when there was no evidence to rebut the fit parent presumption that the parents be appointed joint managing conservators or that appointment of the parents as joint managing conservators would significantly impair A.F.L.'s physical or emotional development; (2) finding that the grandparents had standing to seek conservatorship of A.F.L. over Dustin's objection when the grandparents failed to meet their burden of proving that Dustin was an unfit parent and that denying grandparent's conservatorship would significantly impair A.F.L.'s emotional or physical wellbeing and issuing temporary orders granting the grandparents joint managing conservatorship with Dustin and Briana and awarding the grandparents the exclusive right to designate A.F.L.'s residence; and (3) failing to deny the grandparents' petition seeking custody because their petition did not have an affidavit that alleged sufficient facts in compliance with Texas Family Code § 153.432(c). *See* TEX. FAM. CODE ANN. § 153.432(c). Dustin further sought emergency relief to stay the trial court's order.

This Court granted Dustin's request for emergency relief and requested and received a response to the petition for writ of mandamus from the grandparents. The grandparents allege that they filed suit under the general standing statute, § 102.003, because they had possession of the child for more than six months. *See id.* § 102.003(a)(9). In answer to the contention that the affidavit was legally and factually insufficient under § 153.432(c), the grandparents allege that the trial court had sufficient facts to determine standing based on previous hearings. *See id.* § 153.432(c).

14

## II.    MANDAMUS

Mandamus is an extraordinary and discretionary remedy. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 883 (Tex. 2021) (orig. proceeding); *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). The relator must show that (1) the trial court abused its discretion, and (2) the relator lacks an adequate remedy on appeal. *In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 787 (Tex. 2021) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135–36; *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding). "The relator bears the burden of proving these two requirements." *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam); *Walker*, 827 S.W.2d at 840.

Because a trial court's temporary orders are not appealable, mandamus is an appropriate vehicle for review. *See In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (orig. proceeding) (per curiam); *In re Walser*, 648 S.W.3d 442, 445 (Tex. App.—San Antonio 2021, orig. proceeding); *In re Strickland*, 358 S.W.3d 818, 820 (Tex. App.—Fort Worth 2012, orig. proceeding); *In re Ostrofsky*, 112 S.W.3d 925, 928 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding).

## III.    STANDING

We take Dustin's issues out of order. Dustin's second issue pertains to standing. "[S]tanding involves a threshold determination of whether a plaintiff has a sufficient 'justiciable interest' in the suit's outcome to be entitled to a judicial determination." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018) (quoting *Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 848–49 (Tex. 2005)). Unless a party has standing, the trial court lacks subject matter

jurisdiction over the case, and the merits of the claims at issue cannot be litigated or determined. *In re H.S.*, 550 S.W.3d at 155.

In his second issue, Dustin asserts that the trial court abused its discretion by determining that the grandparents had standing to seek conservatorship of A.F.L. because A.F.L.'s grandparents failed to meet their burden to prove that denying their request would significantly impair the child's emotional or physical well-being under § 102.004 of the family code. *See* TEX. FAM. CODE ANN. § 102.004. In contrast, the grandparents allege that they possessed general standing under § 102.003 of the family code. *See id.* § 102.003. We review both provisions.

## A.    Standard of Review

Standing implicates a court's subject-matter jurisdiction and presents a question of law that we review de novo. *In re H.S.*, 550 S.W.3d at 155; *In re Gandy*, 649 S.W.3d 921, 924 (Tex. App.—Eastland 2022, orig. proceeding); *In re T.H.*, 650 S.W.3d 224, 235 (Tex. App.—Fort Worth 2021, orig. proceeding). When determining whether standing exists, we construe the pleadings in the light most favorable to the plaintiff and consider evidence offered by the parties. *In re H.S.*, 550 S.W.3d at 155; *In re Gandy*, 649 S.W.3d at 925. We do not examine whether the plaintiff will prevail on the merits. *See In re H.S.*, 550 S.W.3d at 155; *In re Torres*, 614 S.W.3d 798, 801 (Tex. App.—Waco 2020, orig. proceeding). In evaluating standing, we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties. *In re H.S.*, 550 S.W.3d at 155; *In re Gandy*, 649 S.W.3d at 925. Because standing to bring a suit affecting the parent-child relationship is governed by the Texas Family Code, we apply principles of statutory

16

interpretation in determining whether a plaintiff falls within the category of persons who possess standing. *In re H.S.*, 550 S.W.3d at 155.

**B.     Section 102.004**

Dustin contends that the grandparents lack jurisdiction under § 102.004 of the family code which concerns "Standing for Grandparent or Other Person." TEX. FAM. CODE ANN. § 102.004. This section provides:

(a)     In addition to the general standing to file suit provided by Section 102.003, a grandparent, or another relative of the child related within the third degree by consanguinity, may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:

(1)     the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development; or

(2)     both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit.

(b)     An original suit requesting possessory conservatorship may not be filed by a grandparent or other person. However, the court may grant a grandparent or other person, subject to the requirements of Subsection (b-1) if applicable, deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this chapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

(b-1)   A foster parent may only be granted leave to intervene under Subsection (b) if the foster parent would have standing to file an original suit as provided by Section 102.003(a)(12).

(c)     Possession of or access to a child by a grandparent is governed by the standards established by Chapter 153.

*Id.*

17

## C. Section 102.003

In contrast, the grandparents contend that they possess standing under § 102.003. *See id.* § 102.003. Section 102.003 provides general standing to any person who falls into one of its fourteen categories. *Id.* § 102.003(a)(1)–(14). As relevant here, subsection (a)(9) provides standing for "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than [ninety] days preceding the date of the filing of the petition." *Id.* § 102.003(a)(9). "In computing the time necessary for standing under Subsection[] (a)(9) . . . , the court may not require that the time be continuous and uninterrupted but shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit." *Id.* § 102.003(b). We determine the child's principal residence by looking at the following factors: (1) whether the child has a fixed place of abode within the possession of the party, (2) occupied or intended to be occupied consistently over a substantial period of time, and (3) which is permanent rather than temporary. *In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.—Fort Worth 2008, orig. proceeding).

Subsection (a)(9) does not include nonparents who do not share a principal residence with the child, regardless of how extensively they participate in caring for him or her. *In re H.S.*, 550 S.W.3d at 156. The care, control, and custody exercised under subsection (a)(9) does not need to be at the exclusion of the parents. *Id.* at 160. Under this section, a nonparent is granted standing if, for a six-month period, "the nonparent served in a parent-like role by (1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance, and direction similar to that typically exercised on a day-to-day basis by

18

parents with their children." *In re H.S.,* 550 S.W.3d at 159–60. A nonparent does not need to have exercised ultimate legal authority to control the child and the parents do not need to have wholly relinquished their parental rights and responsibilities. *Id.* at 160.

**D.     Analysis**

Reviewing both § 102.004 and § 102.003, we conclude that the grandparents established standing as persons who had actual care, control, and possession of A.F.L. for at least six months ending not more than ninety days preceding the date of the filing of the petition. *See* TEX. FAM. CODE ANN. § 102.003(a)(9). Here, A.F.L. was born on June 23, 2021. It is uncontested that from the date of her birth through the events at issue here, A.F.L. resided with Carl and Maria, and Carl and Maria assisted Briana by serving in parent-like roles to A.F.L. Briana resided at the house with A.F.L., Carl, and Maria from June 23, 2021 until either December 30, 2021, or the first week in January 2022. Briana testified that for the first three months after A.F.L.'s birth, while she was not working, she took care of A.F.L.'s needs. However, Briana conceded that in August of 2021, A.F.L.'s crib was moved to Carl and Maria's room because Briana "couldn't take it" and "[was] not in control of [herself] . . . mentally." Briana's December 30, 2021 statement provides that she gave "temporary custody" of A.F.L. to Carl and Maria with the rights to provide A.F.L. with medical care and enroll her in any necessary preschool or daycare. Carl filed his original petition on May 3, 2022 and Carl and Maria filed their amended petition on May 6, 2022. These petitions both stated that A.F.L. had lived with Carl, or Carl and Maria, for six or more months.

In the trial court, Briana disagreed that that A.F.L. had been living with Carl and Maria for more than six months as required under our standing analysis, because "[s]he

has only been living with them without my presence since the beginning of 2022." However, the family code does not require Briana to have left the premises, or to have wholly ceded her parental rights and responsibilities, in order for Carl and Maria to possess standing. *See In re H.S.,* 550 S.W.3d at 160. In short, Carl and Maria played parent-like roles in A.F.L.'s life for more than six months before they filed their original and amended petitions. *See id.* Thus, the trial court may reasonably have concluded that Carl and Maria exercised care, custody, and control of A.F.L. for the relevant statutory period and possessed standing. *See* TEX. FAM. CODE ANN. § 102.003(a)(9); *In re H.S.,* 550 S.W.3d at 156, 160. Accordingly, we overrule Dustin's second issue pertaining to standing.

## IV. SECTION 153.432 AFFIDAVIT

In his third issue, Dustin contends that the trial court abused its discretion in failing to deny the grandparents' request for custody because their petition did not have an affidavit that alleged sufficient facts in compliance with Texas Family Code § 153.432(c) to allow the trial court to hold a hearing.

### A. Section 153.432

Section 153.432 of the family code allows a grandparent to file an original suit or a suit for modification "request[ing] possession of or access to a grandchild in a suit filed for the sole purpose of requesting the relief, without regard to whether the appointment of a managing conservator is an issue in the suit." TEX. FAM. CODE ANN. § 153.432(a), (b). However, the grandparent

> must execute and attach an affidavit on knowledge or belief that contains, along with supporting facts, the allegation that denial of possession of or access to the child by the petitioner would significantly impair the child's physical health or emotional well-being. The court shall deny the relief

20

sought and dismiss the suit unless the court determines that the facts stated in the affidavit, if true, would be sufficient to support the relief authorized under [§] 153.433.

*Id.* § 153.432(c); *see* TEX. GOV'T CODE ANN. § 311.016(2) ("'Shall' imposes a duty.").

## B. Analysis

On May 6, 2022, the grandparents filed an amended petition asking for them to be named as "Nonparent Sole Managing Conservator" of A.F.L., advising the court that they were "concerned about the safety" of A.F.L., and requesting that the parents' possession be limited to day visits, be supervised, and that parents be ordered not to use alcohol or illegal drugs prior to possession. Section 153.432 applies to a grandparent's suit requesting possession of or access to a grandchild—not to a suit seeking a conservatorship. *See id.* § 153.432(a); *see also In re M.L.R.S.*, No. 14-20-00584-CV, 2022 WL 2165539, at *3 (Tex. App.—Houston [14th Dist.] June 16, 2022, no pet.) (mem. op.) ("[S]ection 153.432 applies to a grandparent's suit requesting possession of or access to a grandchild—not to a suit seeking a conservatorship."); *In re G.B.*, No. 05-21-00463-CV, 2021 WL 4071152, at *2 n.4 (Tex. App.—Dallas Sept. 7, 2021, orig. proceeding) (mem. op.) ("Because the trial court found that Grandmother has standing under [§] 102.003 and we conclude this was not in error, we need not consider whether Grandmother also has standing under [§§ 153.433-.434]."); *In re M.B.*, No. 09-19-00247-CV, 2019 WL 4865197, at *5 (Tex. App.—Beaumont Oct. 3, 2019, no pet.) (mem. op.) (concluding that § 153.432 did not apply to cases involving conservatorship claims); *In re C.D.M.*, No. 11-15-00319-CV, 2016 WL 5853261, at *1 (Tex. App.—Eastland Oct. 6, 2016, no pet.) (mem. op.) (concluding that the grandparents' "satisfaction of the general standing statute . . . relieved them from having to comply with the additional requirements of [§] 153.432").

21

Because the grandparents established standing under the general standing statute and they sought conservatorship, they were not required to file an affidavit. We overrule Dustin's third issue contending otherwise.

## V.     FIT-PARENT PRESUMPTION AND SIGNIFICANT IMPAIRMENT

By his first issue, Dustin contends that the trial court abused its discretion by entering temporary orders granting the grandparents joint managing conservatorship and awarding the grandparents the exclusive right to designate the residence of A.F.L. when there was no evidence to rebut the fit parent presumption that the parents be appointed joint managing conservators or that appointment of the parents as joint managing conservators would significantly impair the child's physical or emotional development. Dustin contends that he is entitled to a "fit parent" presumption under Texas Family Code § 153.131, and there was no evidence presented rebutting that presumption or that the A.F.L. would suffer significant impairment if Dustin were to be awarded custody. The grandparents do not directly address this issue, but instead simply reiterate that they had standing to bring suit under §102.003. *See* TEX. FAM. CODE ANN. § 102.003.

## A     Fit Parent Presumption

"[T]he United States Constitution 'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" *In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) (orig. proceeding) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Thus, to protect this right, we apply a presumption that a fit parent acts in the best interest of their child. *See id.*; *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). The Texas Family Code employs a "parallel presumption" regarding conservatorship. *In re C.J.C.*, 603 S.W.3d at 807. The

22

code provides:

> (a)    Subject to the prohibition in [§] 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.
>
> (b)    It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

TEX. FAM. CODE ANN. § 153.131;[4] *see Danet v. Bhan*, 436 S.W.3d 793, 796 (Tex. 2014) (per curiam) ("The law establishes a preference in favor of a child's parents . . . providing that courts 'shall' appoint the child's parent . . . as the child's sole managing conservator . . . ."). Thus, when both a parent and a nonparent seek conservatorship, Texas law requires that the child's parent be appointed sole managing conservator, absent a proper finding that the appointment of the parent as a sole managing conservator would significantly impair the child's physical health or emotional development. *See id.*; *Danet*, 436 S.W.3d at 796.

We review conservatorship determinations for abuse of discretion and reverse only if the decision is arbitrary and unreasonable. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); s*ee also Lewelling*, 796 S.W.2d at 167 (observing that the "strong presumption" in favor of parental custody imposes a "heavy burden on a nonparent" and that "[i]t is no longer adequate to offer evidence that the nonparent would be a better custodian of the

---

[4] Section 153.131 is expressly made subject to Family Code section 153.004, which provides another exception to the parental presumption. *See id.* § 153.131(a). Section 153.004(b) concerns cases where "credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child." *Id.* § 153.004(b*); see In re J.J.G.*, 540 S.W.3d 44, 56 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). No one alleges that this section is relevant to this case.

23

child"). Our ultimate consideration is the best interest of the child. *See* TEX. FAM. CODE ANN. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). "For a nonparent to overcome the presumption that it is in the child's best interest to be in a parent's custody, there must be evidence of specific and identifiable conduct by the parent that is likely to cause harm to the child's physical health or emotional development." *In re A.D.T.*, 588 S.W.3d 312, 317 (Tex. App.—Amarillo 2019, no pet.); *see Lewelling*, 796 S.W.2d at 167 (requiring "evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child"). The evidence cannot merely raise a suspicion or speculation of possible harm. *See In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.). "Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent," and "[t]he material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *Id.*

The government may not "infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better decision' could be made." *In re Derzapf*, 219 S.W.3d at 333 (quoting *Troxel*, 530 U.S. at 72–73). "[S]o long

as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family." *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (orig. proceeding) (per curiam) (quoting *Troxel*, 530 U.S. at 68). Thus, evidence that a "nonparent would be a better custodian of the child" is not adequate to meet the statutory burden. *Lewelling*, 796 S.W.2d at 167; *see In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied).

## B.    Analysis

Under the family code, the trial court was required to appoint a parent as sole managing conservator or both parents as joint managing conservators of A.F.L. unless the appointment "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131; *see Danet*, 436 S.W.3d at 796. The grandparents had the burden to overcome the parental presumption imbedded in § 153.131. However, in the trial court, the grandparents neither asserted that Dustin was an unfit parent nor that appointing him as conservator would significantly impair A.F.L.'s physical health or emotional development. Nor do the grandparents contend otherwise in this original proceeding.

Implying all necessary findings in favor of the trial court's temporary order, the evidence presented at the hearings does not rise to the level that could support the temporary order under § 153.131. Put simply, there is no evidence of specific acts or omissions of Dustin that demonstrate that an award of custody to him would result in physical or emotional harm to A.F.L. *See id.* Without evidence to support any finding that appointing Dustin as A.F.L.'s conservator would significantly impair her physical health or emotional development, we conclude the trial court erred. We sustain Dustin's first issue

25

presented in this original proceeding.

## VI. CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus, the response, and the applicable law, is of the opinion that Dustin has met his burden to obtain relief, in part, as to the trial court's award of conservatorship. In so ruling, we note that the record indicates that all parties have A.F.L.'s best interests at heart, and we trust that they will work together in the future to ensure her well-being.

We lift the stay previously imposed in this case. We conditionally grant the petition for writ of mandamus, in part, and direct the trial court to vacate its award of conservatorship and enter an order in accordance with this memorandum opinion. We deny mandamus relief, in part, as to Dustin's requested relief pertaining to standing. Our writ will issue only if the trial court fails to comply.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
24th day of February, 2023.

26