# Supreme Court of Texas

No. 23-0697

State of Texas; Office of the Attorney General of the
State of Texas; Texas Medical Board; Texas Health and Human
Services Commission; and Ken Paxton, in his official capacity as
Attorney General of the State of Texas,

*Appellants*,

v.

Lazaro Loe, individually and as next friend of Luna Loe, a minor;
Mary Moe and Matthew Moe, individually and as next friends of
Maeve Moe, a minor; Nora Noe, individually and as next friend of
Nathan Noe, a minor; Sarah Soe and Steven Soe, individually
and as next friends of Samantha Soe, a minor; Gina Goe,
individually and as next friend of Grayson Goe, a minor;
PFLAG, Inc.; Richard Ogden Roberts III, M.D.; David L. Paul,
M.D.; Patrick W. O'Malley, M.D.; and American Association of
Physicians for Human Rights, Inc. d/b/a GLMA: Health
Professionals Advancing LGBTQ Equality,

*Appellees*

On Direct Appeal from the
201st District Court, Travis County, Texas

JUSTICE YOUNG, concurring.

The primary way to determine state policy is through the process of self-government. That is even true—perhaps *especially* true—for settling profound disputes that affect individuals' deeply felt values and our shared

identity as a State. As Justice Blacklock observes, Senate Bill 14 and the litigation that followed its enactment implicate political, philosophical, and moral issues of immense importance to citizens who are in intractable disagreement. Politics, philosophy, and morality have always been engines for the law and have given rise to our most sweeping and treasured constitutional guarantees, as well as many landmark statutes. Making those choices lies at the core of self-government, which belongs to the People and their representatives in the first two branches.

The third branch—the judiciary—participates in self-government in a different way. Our authority extends only to saying what the law *is* and then to applying that law to disputes. If we do our job properly, we facilitate self-government by clarifying the law so that, if the People want it to be different, they may adjust it as they see fit. Our task is essentially the same even when we address a constitutional challenge to a statute. The ultimate question for us then is whether the People have *already* exercised their power to govern themselves by withdrawing a topic from the ordinary political processes. Sometimes, therefore, the judicial duty is to determine which of two competing exercises of self-government has a higher claim to the status of being the law.

Legal difficulty often has no correlation with legal importance, let alone with political, philosophical, or moral significance. Identifying the correct legal rule can be very hard when the stakes are low; it can be very easy when the stakes are high. Today's case, I conclude, is weighty primarily because of its consequences in real life, not because of its legal difficulty. The Court correctly concludes that the Constitution has not withdrawn from the legislature's authority the subject matter that

2

Senate Bill 14 regulates.  That is the entirety of today's decision and it is enough to discharge the judiciary's obligation.  It means that the Court now returns the issue to the other branches and the People in their continuing exercise of self-government.  I therefore join the Court's opinion and its judgment.

At the same time, however, self-government sometimes literally means *self*-government—the autonomy of an individual or a family to conduct their affairs without needing permission from the majoritarian political process.  The fundamental right of parents over the upbringing of their children—the right invoked today—is one such example.  The parents before us forcefully argue that Senate Bill 14 trespasses into a constitutionally protected zone of parental autonomy, and that the courts must protect that zone from intrusion by the State.  Our dissenting colleague likewise powerfully defends the concept of parental autonomy, particularly in the medical context.

The parents' claims and our colleague's arguments warrant respect.  I accordingly write separately to note my agreement with a basic premise of those arguments: that there *is* a zone of parental authority that is inviolate from incursions by ordinary political means.  Delineating the extent of that zone is a matter of great importance, so I describe my understanding of how the judiciary makes that determination for any given claimed exercise of parental authority.  There is peril in erring in either direction, either by mistakenly expanding or contracting an unenumerated fundamental right.  Casting the right too broadly amounts to the judicial usurpation of the right of self-government by the People; casting the right too stingily amounts to the judicial usurpation of the

3

right of self-government by a person. It is *this* analysis that can seem difficult, so I explain why today's decision correctly, and in the end simply, resolves the specific claim before us.

**I**

As the Court acknowledges, the parents here seek to provide their children with what the parents believe to be medical care that their children genuinely need. This acknowledgment does not divide the Court. *See, e.g.*, *ante* at 2–4 (opinion of the Court); *post* at 1 (Lehrmann, J., dissenting). It is easy to see that the "parents seeking transgender therapy" for their children here, and many other parents, unquestionably "act out of genuine love and conviction." *Ante* at 16 (Blacklock, J., concurring). The parents frame their claim by invoking the fundamental right of all fit parents, which this Court has long recognized and which strikes me as among the most powerful claims they could make based on an unenumerated right. "[O]ur law recognizes the parent-child relationship as sacred: 'This natural parental right [is] a basic civil right of man[] and far more precious than property rights.'" *In re J.W.*, 645 S.W.3d 726, 752 (Tex. 2022) (Young, J., concurring) (second and third alterations in original) (quoting *In re A.M.*, 630 S.W.3d 25, 25 (Blacklock, J., concurring in denial of review) (in turn quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985))).

At the same time, it is challenging to define the exact contours of this right. Courts ordinarily look to the original public meaning of legal *texts* to determine the scope of a right or duty. The fundamental right of parents, however, is unenumerated. This textual silence is problematic because it is dangerous (and often self-aggrandizing) for courts to

4

attempt to define a constitutional concept that is unexpressed in the Constitution's text. Enforcing a judicial conception of an unwritten constitutional right displaces the function of self-government. If a court is wrong, it has forced our citizens to collectively obey commands that their Constitution has not (and thus that the People themselves have not) actually made. One can simultaneously agree that unenumerated rights exist *and* worry about the judiciary abusing any authority it may have to say what they are. For that reason, among others, *how* to protect unenumerated rights is typically left to the political process of self-government.

The U.S. Supreme Court and this Court, however, acknowledge a narrow exception. Sometimes the reason that a right is unenumerated is that it is *so* fundamental to our legal tradition and culture that reducing it to writing may never even have occurred to the drafters. When—as an objective matter—there could be almost no dispute about its existence, the right is reasonably recognized as part of the background assumptions of the law.

Parental authority is part of that background, which is why it is never particularly controversial to acknowledge its status as a fundamental right, at least as a general matter. To see why, compare it to some of our most treasured *enumerated* rights, such as the freedom of speech or the free exercise of religion. I claim those rights for myself and would do so whether they were written down *or not*. The Framers of the United States and Texas Constitutions would too. But those rights had to be enumerated precisely *because* they have been repeatedly violated and transgressed throughout Anglo-American legal history. So too with

most of the rest of the Bill of Rights. Many protections for criminal defendants, for example, reflect a history of general (and often quite specific) patterns of governmental abuse. The Sixth Amendment right of a defendant "to be confronted with the witnesses against him" has a deep and dark history of violation, warranting specific textual protection. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 50 (2004).

The core functions of parenthood are different. There has never been any real doubt or dissent about the obligations and authority of parenthood in our legal tradition and culture (and I imagine that this is true globally). Importantly, there is no history of governmental interference with the essential autonomy of parenthood that is analogous to the historical interference with textually expressed rights. Our People's traditions and laws have always regarded that autonomy as self-evident. This pattern is essential for the judiciary to recognize any unenumerated fundamental right: an objective, widespread, unbroken, and respected *practice* of the right is what allows courts to recognize it without fearing that they themselves are becoming lawmakers.

*Nonetheless*, courts should warily approach any claim of a fundamental but unenumerated right. The U.S. Supreme Court has treated the due-process clause as protecting such rights, but emphasized that judges must "'exercise the utmost care whenever we are asked to break new ground in this field,' . . . lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary]." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). Such a "transform[ation]" does not necessarily entail bad faith on the part of

6

judges—rather, it reflects an acknowledgment by the Court with the fewest restraints on its power that it can be easy to mistake one's own values or beliefs for the commands of the law. As *Glucksberg* explained, therefore, unenumerated rights must be specific and granular, not general or vague. The risk of the judiciary invading the ordinary processes of self-government is too great to accept anything short of precision. *See id.* at 721.

*Glucksberg* continues to provide the best analytical framework for assessing claims of unenumerated rights because it properly strikes the balance. It accepts that some rights are indeed so deeply engrained that committing them to writing would hardly have occurred to the Founding generation. At the same time, *Glucksberg*'s test tempers judicial authority to recognize such rights with proper humility by insisting on specificity, both as to what the right is *exactly* and as to how our history and traditions prove the unbroken and unchallenged existence of that specific right. The Court today follows *Glucksberg*'s guidance in this way, *see ante* at 14, 17–23, which is part of why I join its opinion.

Whether unenumerated parental rights are properly grounded in the federal due-process clause (or the Texas due-course clause) or elsewhere is a wholly distinct question. There has been ample criticism of the federal choice. Rather than a manifestation of substantive due process, Justice Scalia described the "right of parents to direct the upbringing of their children" as "among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'" *Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J., dissenting)

7

(alterations in original). Justice Blacklock has likewise expressed skepticism about the due-process clause being the proper constitutional framework. *In re H.S.*, 550 S.W.3d 151, 177–78 (Tex. 2018) (Blacklock, J., dissenting). And without doubting the right, I have expressed doubt about whether the due-course clause of the Texas Constitution is the correct lens through which to view the fundamental right of parenthood in Texas law. *See Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 674 (Tex. 2022) (Young, J., concurring).

But none of that matters much for present purposes; what does matter is that parents' rights *exist* and are properly defined, at least by courts, through the specificity and granularity that *Glucksberg* describes. The other branches, of course, are free to expand even *enumerated* rights far beyond the text, and they certainly may by statute protect the rights of parents and children even more substantially than the courts do. But absent a constitutional amendment, the first two branches may not restrict those rights—a further reason for judicial caution and precision, as always in constitutional adjudication.

## II

The foregoing principles yield two results. The first is that there *is* a considerable zone of parental authority or autonomy into which the State may not intrude with a mere rational basis—and perhaps in some instances into which the State may not intrude at all. When viewed at a proper level of specificity, in other words, there *are* some parental rights that likely are even "absolute." The second result is that the claim of parental authority in *this* case is outside the zone of authority or autonomy, and so the ordinary process of self-government remains intact.

8

## A

My first point is, I hope, not terribly novel: like the Texas Constitution, the federal Constitution "has been held to bestow upon parents unique and near-absolute powers of control over other persons, namely their children."  Anne C. Dailey, *In Loco Reipublicae*, 133 Yale L.J. 419, 423 (2023).  True enough—it is a sensible default rule and has manifested in specific contexts over the past century.  *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923) (recognizing a "liberty" interest in the right of parents to "establish a home and bring up children" and "to control the education of their own"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (holding that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control").  *Pierce* recognized that "the right" is "coupled with the high duty" of "prepar[ing] [children] for additional obligations."  268 U.S. at 535.  The Court again acknowledged parents' right to direct the education of their children in *Wisconsin v. Yoder*: "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.  This primary role of the parents in the upbringing of their children" makes the role that parents play "established beyond debate as an enduring American tradition."  406 U.S. 205, 232 (1972).  The Court put it succinctly in *Troxel*:

> [S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be *no reason* for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

530 U.S. at 68–69 (emphasis added).  In fact, parents' right to the care,

9

custody, and control of their children is so valued and deeply entrenched that the Supreme Court recognized a *presumption* that fit parents act in the best interests of their child. *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

This Court has repeatedly embraced similar views as lying within our constitutional jurisprudence. As the Court notes, we have quoted the passage from *Troxel* that is indented above. *Ante* at 15 (quoting *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006)).

It is clear that there *is* a constitutional zone of parental autonomy, as all these cases confirm. At the same time, "parental autonomy" is a category, not a single rule or right—specificity is required to identify what falls within the zone. The law is still somewhat opaque on that point. "[T]he Supreme Court has not described the contours of the [fundamental] right [of parenthood] with clarity." *In re H.S.*, 550 S.W.3d at 175 (Blacklock, J., dissenting).

The answer is to view claims of parental authority through the lens that *Glucksberg* provides for *any* assertion of an unenumerated right. The foregoing analysis shows that, probably more than in any other context, parents start with a presumption favoring their authority because our legal tradition generally excludes all others from exercising authority over a child's upbringing. Fit parents have a monopoly, or something close to it, in making decisions for their children. Particular actions and decisions can be analyzed to ensure that a parent's claimed right is indeed one that is deeply rooted in our society's legal traditions and history. It is hard to imagine, for example, a serious contention that anyone *other* than a fit parent could direct a child's religious upbringing. Who else would have that authority? A stranger? Some more distant

10

relative? The government? The same analysis would apply to many other aspects of child rearing—the choice of clothing, diet, reading material, entertainment options, companions, and the like. Within the broad range of lawful options for such topics, neither the government nor anyone else may countermand the authority of fit parents to determine what is best for their children. The government may not intrude into the scope of parental authority as to such matters absent extraordinary justifications, or in some cases, perhaps not at all.

To determine whether an action does *not* fall within the historic concept of caring for and raising children—thus enabling State regulation—we must analyze each claim at a specific level. This is why, for example, the legislature may penalize anyone, whether parent or stranger, for subjecting children to sexual abuse or exposing children to high risks of physical danger or deprivation. Such unlawful conduct has never been protected. The legislature has the authority to pass generally applicable laws for the protection of children that do not violate parents' rights but instead reflect parents' obligations to their children.

Conduct that constitutes abuse and neglect, after all, is not the kind of conduct that our history, tradition, or law has ever characterized as within the zone of options for a parent, even though parents have extraordinarily broad discretion regarding how to care for children. Take the diet example from my list above. Parents can essentially choose what they deem proper for their children's nourishment—but wholly denying sustenance to their children is not a choice that constitutes care, custody, or control. If it were otherwise, the State would be helpless to protect the children who need it the most: the small minority of children whose

11

parents are not fit and who, instead of defending their children, either leave them defenseless or affirmatively subject them to harm.

When a particular course of conduct is not deeply rooted in our State's history and traditions as part of the zone of lawful choices for parents, courts may not declare, in the name of the Texas Constitution, that the State is powerless to legislate. Our precedents suggest that parental authority is absolute *within* the realm of lawful choice—but there are areas altogether outside that realm.

## B

This brings me to my second point: that the claim in this case ultimately founders because, at the appropriate level of specificity, there is no history or tradition that allows parents the sort of sweeping authority over all newly developed medical procedures that is demanded here. I agree with the view implicit in Justice Blacklock's concurrence that, even had the parents relied on a powerful *enumerated* right like the free exercise of religion, they likely would not have prevailed. *Ante* at 15 (Blacklock, J., concurring). Courts have sometimes recognized that the state's interest in preventing serious medical harm to children may override parents' interest in making medical decisions for those children. *See Jehovah's Witnesses v. King County Hosp. Unit No. 1*, 390 U.S. 598 (1968) (per curiam), *aff'g* 278 F. Supp. 488 (W.D. Wash. 1967).

The corollary to the limitations on government power as to parental choices that are deeply embedded in our history and traditions is this: the State retains considerable authority over new developments that raise novel and previously unconsidered questions arising in areas that never were regarded as lying within parents' authority. For actions

12

or decisions that lack such objective roots, judges will rarely be able to affirmatively conclude that "the people of this [State] ever agreed to remove debates of this sort—over the use of innovative, and potentially irreversible, medical treatments for children—from the conventional place for dealing with new norms, new drugs, and new public health concerns: the democratic process." *L.W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023). That democratic process—self-government—is never completely played out, but for now, the elected representatives of the People of Texas have acted in a way that they believe upholds their duty to regulate the practice of medicine, *see ante* at 16–17, 21–22 (opinion of the Court), and to protect children from new and controversial treatments that the legislature is entitled to regard as harmful.

Parents and citizens may passionately disagree with the legislature's conclusion or its depiction of these treatments as "harmful." They have every right to try to overturn the legislature's ban on those treatments—but they cannot achieve that result in the courts of Texas. The use of drugs or surgery to counteract a child's normal biological development and function is not a course of conduct that our legal traditions have committed to the realm of parental discretion. It *is* within the zone of lawful regulation, including regulation of the medical profession. For that reason, the Constitution leaves the matter to the process of self-government.

Evan A. Young
Justice

**OPINION FILED:** June 28, 2024

13